FILED _____ LODGED
RECEIVED _____ COPY

JUL 2 5 2011

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ S DEPUTY

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

SHARON LOUISE HODGES,
2601 E. McKellips #1081
Mesa AZ  85213
480-399-0622

        Plaintiff,

        v.

STEVEN WRAY GRIMAUD, and
MELINDA GRIMAUD,
1600 Angus Court
Crofton MD 21114-2002
(301) 858-9036

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL NO: 11-CV-143-8-PHX-SRB

PLAINTIFF'S FIRST AMENDED
COMPLAINT;
FRAUD UPON THE COURT;
FAILURE TO PAY A PAST DUE
CHILD SUPPORT OBLIGATION;
ABUSE OF PROCESS;
DEFAMMATION;
INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS.

(Rule 60(b) and (d))
(Bivens v.6 (403 U.S. 388 (1971))

**THE PARTIES**

Plaintiff, Sharon Hodges, is a resident of Maricopa County, Arizona.

Steven Grimaud and defendant Melinda Grimaud, are residents of Anne Arundel County, Maryland.

Steven Grimaud and the plaintiff, Sharon Hodges, were married for approximately 8 years, from 1969 until 1977.  They have a daughter, JG, born in 1971.

**JURISDICTION**

Diversity jurisdiction exists in this matter. The parties to this action reside in separate States and the amount of controversy exceeds $75,000.00. (28 U.S.C. § 1332)

Defendant, Steven Grimaud, is an Executive Officer at the United States Department of Defense.   Defendant is sued here under *Bivens v.6* [403 U.S. 388 (1971)] for actions that violated plaintiff's rights to Redress and Due Process guaranteed by the First Amendment.

1

Defendant also has a past due child support obligation as defined by the Deadbeat Parents Punishment Act, 18 U.S.C. Sec. 228, and it's predecessor statutes, URESA and CSRA.

Plaintiff seeks relief from prior proceedings involving the defendant under Rule 60(b)(1)(2)(3)(6).  Plaintiff is bringing an independent action for Fraud Upon the Court under Rule 60(d)(1)(3).

**VENUE**

The Federal District of Arizona is the proper venue.

**SUMMARY**

This action arises where defendant, Steven Grimaud, was recruited by the NSA during his marriage to the plaintiff, but concealed his Federal employment, knowing she would never cooperate with his plans.  The parties were married when the defendant was enlisted in the Navy Security Group ("NSG").  Defendant was the subject of numerous disciplinary actions involving alcohol abuse, and disclosing classified information while he was drunk.  Defendant was habitually intoxicated, and often disclosed classified information to the plaintiff at home.  When plaintiff questioned his activities, he made up alibis and excuses, and told her to "mind your own business." Circumstances were so severe, that plaintiff threatened to divorce him, if he continued with any career involving the military.  Defendant, however, was "busted" down in rank and discharged in 1971.

After his discharge, defendant was offered a graduate position in the Russian Studies Department at U.C. Davis.  Defendant continued to drink, and engaged in a lot of emotional abuse at home.   When defendant received an offer from the NSA, he knew that the plaintiff would never cooperate with his plans.  Defendant left the parties' home, and abandoned his 5 year old daughter, and refused to provide any material support.   Defendant received his incentive package and began his employment with the NSA in complete secrecy.

2

CIVIL NO: 11-CV-143-8-PHX-SRB

1      Defendant alleged to his parents and family, that his employment at the NSA was

2   "secret", and they could not tell the plaintiff where he worked.  In fact, the NSA has no such policy.

3   Defendant twisted the intent of the NSA's policies on national security, to avoid telling the plaintiff.

4      Defendant concealed his Federal employment during the parties' separation and divorce.

5   Defendant has never been examined for his fitness to pay support.  Defendant has had a Top Secret

6   Clearance for the past 35 years, however, there are no child support orders in any State based on the

7   defendant's Federal employment.   Defendant cut off all contact with the plaintiff in 1980, and

8   never saw JG again.   After he left, plaintiff relied on the fact that her name appeared in his Navy

9   records, and expected to be contacted if the defendant applied for another security clearance.

10      Plaintiff supplemented her earnings with welfare and food stamps, while defendant

11   lived comfortably in Washington DC.  Defendant remarried and adopted his wife's children, giving

12   off the appearance that he was a trustworthy and reliable member of the community.  Plaintiff

13   complained to welfare authorities that the defendant was "missing", but they would only tell her

14   that he moved from their jurisdiction.

15      Plaintiff remarried in 1980, and moved to Tucson AZ in 1984.   When plaintiff

16   separated from her husband, she asked the District Attorney to locate the defendant.   The District

17   Attorney, however, suspected child support fraud. Defendant was served with a timely action for

18   non-support in Prince Georges' County MD, however, officers of the court refused to examine him

19   for child support.   Plaintiff was excluded from the proceedings and did not appear. The DA

20   apologized to the plaintiff later, saying: *"His employer refused to cooperate.  He offered to pay*

21   *$260.00 a month.  You should probably take the money because something is better than nothing."*

22      Defendant began living in the open, after the statute of limitations expired.  Defendant

23   ran for public office, and sat on the local boards of nationally known children's charities.

24      In 2003, defendant was appointment by President George W. Bush, to Director of

3

1    Operations of the National Virtual Translation Center ("NVTC"). Plaintiff read about his

2    appointment to the NVTC on the Internet in 2007:

3    http://findarticles.com/p/articles/mi_m0IBS/is_4_31/ai_n16419812/pg_3/ **Military Intelligence
4    Professional Bulletin**, Oct-Dec, 2005 by Kathleen Egan To learn more about the NVTC and to get
     your translation needs Met, visit the NVTC on any of the websites www.nvtc.gov (classified or
5    unclassified) or email **Steve Grimaud, the Director of Operations at sgnmaud@nvtc.gov** to
     discuss your unique needs and how the NVTC can serve you best. If you are interested in the
6    technology used at NVTC, email Dr. Kathleen Egan, the Director of Technology, at
     kegan@nvtc.gov to gain further information."
7

8            The problems began when plaintiff reported the defendant to the Department of

9    Defense.  Plaintiff created a backlash at the Department of Defense.  Plaintiff wrote a letter to the

10   Secretary of Defense, Robert Gates, informing him of the circumstances.  Plaintiff received a letter

11   from Linda Lamb, Deputy Associate General Counsel, National Security Agency, Central Security
12
     Service, Fort George Meade MD:
13
             "Thank you for your letter dated, 6 March 2007, directed to the Secretary of Defense.
14   Please be advised that the National Security Agency does not comment on nor does it confirm or
15   deny the employment of Agency personnel."

16           Plaintiff persisted until Defense investigators agreed to meet with her.   Investigators

17   were confused about her identity, and had no record of her marriage to the defendant.  When

18   investigators realized what happened, they asked the plaintiff to sign a confidentiality agreement

19   and cooperate in an investigation.  When they failed to contact her after a reasonable amount of
20
     time, she contacted the F.B.I.  Defendant was "tipped off" that the plaintiff was talking to Federal
21
22   investigators.

23           F.B.I. agents came to the plaintiff's home, but refused to take the information. When

24   plaintiff explained that the defendant had never paid child support, they suggested that plaintiff try

25   to get over it, and move on.  Plaintiff grew tired of alibis and excuses, and finally called the

26   defendant at his home and demanded that he return her calls.  Defendant hung up the phone on
27
     hearing her voice, and recorded her calls.  Plaintiff expressed her outrage, and demanded that he
28
                                                      4

                                         CIVIL NO: 11-CV-143-8-PHX-SRB

1  apologize to JG.   Defendant recorded the calls, inciting her place even more angry calls.   When she

2  threatened to come to Washington DC, defendant took out an ex parte restraining order, with no

3  notice whatsoever, alleging that the plaintiff was harassing him, and had sent "death threats" to his

4  employer.   The Maryland court barred the plaintiff from Washington DC at the defendant's

5  handwritten request.   Plaintiff was served at her apartment in Palm Springs, CA, 2500 miles away

6  from the defendant.   Defendant also placed the plaintiff's name on a Federal database, directing

7  Federal officers to detain her.

8

9           Needless to say, the Maryland Court exceeded its jurisdiction.   States are barred from

10  interfering with First Amendment rights of redress.   The Maryland Court has no jurisdiction to

11  make orders involving free access in Washington DC.   When plaintiff tried to contact Federal

12  investigators who took her statements, they refused to take her calls.   Plaintiff hired a private

13  investigator, only to learn that her name had been deleted where it would appear as defendant's

14  former wife, and that the District Attorney's file had been destroyed by the Maryland Courts.

15  Plaintiff was also informed that "someone" had "cleaned" the defendant's records.

16

17           When plaintiff hired an attorney in Baltimore, defendant dictated the terms of a "secret"

18  agreement, where he would drop his restraining order, if the plaintiff would stop contacting the

19  Department of Defense and the CIA.   A copy of that draft agreement appears in Plaintiff's Exhibits.

20           When plaintiff refused to sign, defendant went ahead with his order, knowing there was

21  never any real threat at all.    A month later, plaintiff and her daughter, Ann Hodges, were detained

22  by the U.S. Border Patrol at the Vancouver BC, on suspicion that plaintiff was violating a

23  restraining order in Maryland.   The order expired in 2009, but plaintiff's record cannot be expunged

24  without an order from the Federal courts.   The State of Maryland, has no civil procedure to remove

25  the plaintiff's name.   Defendant's actions represent an abuse of process by a Federal Agent, and a

26  violation of the plaintiff's rights to Redress, and Due Process and Equal Protection of the law.

27

28

5

CIVIL NO: 11-CV-143-8-PHX-SRB

1    There is a *prima facie* case that defendants are responsible for all of the damages caused

2    to the plaintiff.   Defendant has always controlled the circumstances.  Plaintiff did not contribute to

3    the injury.  Defendant was willful, and acted with the intent to deceive the plaintiff, and defraud her

4    out of child support.  Defendant, Melinda Grimaud, acted with the defendant, knowing that she was

5    diverting JG's support to her own children:

6

7    **res ipsa loquitur**  n. *Latin for "the thing speaks for itself," a doctrine of law that one is
     presumed to be negligent if he/she/it had exclusive control of whatever caused the injury, even
     though there is no specific evidence of an act of negligence, and without negligence the  would not
     have happened.*

8

9

10    Most courts hold that reckless conduct may also constitute *Scienter*.   The definition of

11    *reckless* includes conduct that reasonable persons know is unsafe or illegal.  Defendants' state of

12    mind and conduct is so reckless as to be intentional.  *Scienter* may be implied by his reckless

13    actions.  Defendant clearly took advantage of the plaintiff's position, to prey on her ignorance and

14    vulnerability.

15    15.    Defendant's Actions Are Unconscionable

16

17    Unconscionable conduct is also found in acts of Fraud and Deceit, where the

18    deliberate Misrepresentation of fact deprives someone of a valuable possession. Whenever

19    someone takes unconscionable advantage of another person, the action may be treated as criminal

20    fraud or the civil action of deceit.  No standardized criteria exist for measuring whether an action

21    is unconscionable. A court of law applies its conscience, or moral sense, to the facts before it and

22    makes a subjective judgment.

23    It is a manifest injustice to allow the defendant to profit from his actions.  Manifest

24    injustice means something which is 'obviously unfair' or 'shocking to the conscience.'  Manifest

25    Injustice constitutes a violation of the guarantees of fundamental fairness and due process of law.

26

27    The Fourteenth Amendment to the U.S. Constitution has been interpreted to provide the same

28                                          6

fundamental guarantees.  The Doctrine of Manifest Injustice is "a proxy for a violation of constitutional rights to due process."


**FIRST CAUSE OF ACTION**

**FAILURE TO PAY A PAST DUE CHILD SUPPORT OBLIGATION**

    A.   Statement of Facts

        1.    Defendant Concealed His Federal Employment from the Plaintiff

            Defendant moved from the parties' home in Davis CA, in 1976.  Defendants began living together less than a year later, and defendant began supporting Melinda's children, never telling the plaintiff.  The defendants filed an ex parte divorce in the wrong jurisdiction, and married in secret.  Defendants moved to Washington DC on an unknown date, leaving no forwarding address or emergency contact information.   In 1980, JG received a greeting card from her grandmother, Jean Grimaud, telling her that her grandfather had died, and that defendant had moved to Washington DC.  When plaintiff wrote back demanding an explanation, she received no replies.  Jean Grimaud died in 2009, having had no contact with JG over her lifetime.

        2.    The Defendant Was Never Restricted

            Plaintiff sought out information on her own, after the Defense Department refused to offer any assistance.   Plaintiff obtained the NSA Employee Handbook in 2010, after another individual downloaded onto the Internet.  The Handbook clearly sets out the Agency's policy with regard to disclosure:

NSA Handbook available at http://www.scribd.com/doc/96390/National-Security-Agency-Employee-Manual:

    ". . .Answering Questions About Your Employment: Certainly, you may tell your family and friends that you are employed at or assigned to the National Security Agency. There is no valid reason to deny them this information. However, you may not disclose to them any information

7

concerning specific aspects of the Agency's mission, activities, and organization.

Verifying Your Employment: On occasion, personnel must provide information concerning their employment to credit institutions in connection with various types of applications for credit. In such situations you may state, if you are a civilian employee, that you are employed by NSA and indicate your pay grade or salary. Once again, generalize your job title.

If any further information is desired by persons or firms with whom you may be dealing, instruct them to request such information by correspondence addressed to: Director of Civilian Personnel, National Security Agency, Fort George G. Meade, Maryland 20755-6000."

The Handbook also clarifies the defendant's duty to disclose his prior marriage to the NSA:

NSA Handbook available at http://www.tscm.com/NSAsecmanual1.html#anon http://tscm.com/NSAsecmanual1.html  http://www.scribd.com/doc/96390/National-Security-Agency-Employee-Manual

"Changes In Marital Status/Cohabitation/Names:  All personnel, either employed by or assigned to NSA, must advise the Office of Security of any changes in their marital status (either marriage or divorce), cohabitation arrangements, or legal name changes. Such changes should be reported by completing NSA Form G1982 (Report of Marriage/Marital Status Change/Name Change), and following the instructions printed on the form."

Defendant received a copy of a similar Handbook when he was hired.  He also attended orientation meetings where this policy was clarified.   Defendant was aware that had a duty to keep the plaintiff apprised of any changes in employment or benefits.  Defendant had an overwhelming duty to disclose his Federal employment to the plaintiff.  Likewise, Melinda Grimaud, had a duty to tell the plaintiff that the defendant had adopted her children, and was supporting them with his earnings.  Defendant never called or wrote, or sent presents, or included JG in any family vacations or holidays.  He did not exercise visitation at all, or provide any of the necessities of life, ie., food, shelter, or clothing.

3.    Defendants Filed A Fraudulent Ex Parte Divorce

Plaintiff supplemented her earnings with welfare and food stamps, while defendant was ordered to pay a minimum of $100.00 a month to welfare authorities. Plaintiff made payment

8

1  arrangements with an attorney in California, and filed a Petition for Divorce in Sacramento County.

2  When plaintiff asked the defendant to help her pay for the divorce, defendant refused, saying "*my*

3  *girlfriend knows how to get one for free.*"  Unknown to the plaintiff, defendant was living with his

4  "girlfriend",  defendant Melinda Grimaud, and supporting her 3 teenage children.

5

6          Melinda Grimaud typed an ex parte petition on blank forms, and filed a concurrent

7  divorce in Spokane.  Case Number 241951, October 6, 1977.  Plaintiff was served with an

8  incomplete Petition, Defendant filed a default with the court commissioner, without the plaintiff

9  being aware.

10          4.      Defendant Adopted 3 Additional Dependants.

11

12          Defendants married almost immediately, and defendant adopted Melinda's children,

13  never notifying the plaintiff.   The State of Washington did not have any mal adoption procedures at

14  that time.   Melinda Grimaud, that regard, acted with the defendant, and was always aware that she

15  was diverting JG's support money, to her own children.

16          5.      Defendant Willfully and Intentionally Violated "A Known Legal Duty"

17          Defendant paid less than $12,000.00 total towards JG's support, a portion going

18  directly to the welfare authorities.   There was no need for the plaintiff to even rely on welfare.

19  Defendant always had sufficient earnings to support Jennifer.

20

21          Defendant willfully refused to pay a past due child support obligation action within the

22  meaning and intent of 18 U.S.C. Sec. 228 (d)(1):

23          ". . .The CSRA federal statute specifically defines a "past due support obligation" as
   any amount determined by a court order or an order under an established administrative procedure

24  of any state which finds child support due from a person to a child or a person with whom a child is
   living; and the obligation has remained unpaid for a period longer than one year, or is greater than

25  $5,000. 18 U.S.C. § 228(d)(1).

26

27          Section 228, which creates an offense for a defendant who "willfully fails to pay a

28

                                                    9

child support obligation," does not define "willfully."  The legislative history of the DPPA suggests that Congress intended to draw the DPPA's concept of "willfulness" from federal tax statutes, 26 U.S.C. §§ 7202, 7203.   On Feb. 25, 1997, the U.S. Attorney General clarified the prosecutorial guidelines, and defined "willfully" as a "violation of a known legal duty" similar to the IRS Tax Code:

> *MEMORANDUM FOR ALL UNITED STATES ATTORNEYS*
>
> *FROM: THE ATTORNEY GENERAL*
>
> *SUBJECT: Prosecutive Guidelines and Procedures for the Child Support Recovery Act of 1992 (REVISED, 2/97)*
>
> ### *The Child Support Recovery Act of 1992*
>
> *The Child Support Recovery Act of 1992 (CSRA), Pub. L. No. 102-521, makes the willful failure to pay a past due support obligation with respect to a child residing in another state a federal offense. 18 U.S.C. § 228.  A first violation of the CSRA is punishable by six months imprisonment and/or a fine. Subsequent violations are punishable by two years imprisonment and/or a fine.*
>
> *The F.B.I. has primary investigatory jurisdiction. Additionally, Special Agents of the Office of the Inspector General of the United States Department of Health and Human Services have been given authority to investigate violations of the CSRA.*
>
> *The following policies and procedures are intended to ensure effective prosecution of the CSRA by providing a means for selecting egregious cases which states are unable to handle because of the interstate nature of the case.*
>
> ***Elements of the Offense***
>
> *The United States must prove the defendant:*
> *1. Having the ability to pay,*
> *2. Did willfully fail to pay,*
> *3. A known past due (child) support obligation,*
> *4. Which has remained unpaid for longer than one year*
> *OR is an amount greater than $5,000,*
> *5. For a child who resides in another state.[1]*
> *Definitions*
> *Past Due Support Obligation*
> *The CSRA defines "past due support obligation" as any amount:*
> *(A) determined under a court order or an order of an administrative process pursuant to the law of a State to be due from a person for the support and maintenance of a child and*

CIVIL NO: 11-CV-143-8-PHX-SRB

*the parent with whom the child is living; and*
    *(B) that has remained unpaid for a period longer than one year, or is greater than $5,000.*
    *18 U.S.C. § 228(d)(1).*

*<u>Willfulness</u>*

    *According to the legislative history, willfulness has the same meaning as it has for purposes of federal criminal tax law.*

    *H. Rep. No. 102-771, 102nd Cong., 2d Sess. at 6.  For criminal tax cases, <u>willfulness</u> is knowing and intentional violation of a known legal duty. <u>Cheek v. United States</u>, 111 S.Ct. 604, 610 (1991). . ."*

"Willfulness" is defined under *sec.* 7203 of the Internal Revenue Code of 1954, 26 U.S.C.A. 26 sec. 7203, p. 347-371:

    "Both failure to file and false filing offenses under Internal Revenue Code require that accused have acted willfully, that is, intentionally in violation of known legal duty.  U.S. v. Burton C.A.5 (Tex.) 1984, 737 F.2d 439."

    H.R. Rep. 102-771, at 6 (1992) (discussing willfulness for purposes of the CSRA) explains, with reference to then-current cases involving criminal federal tax laws, that the willfulness element of a federal tax felony requires the "intentional violation of a known legal duty" and implies a "bad purpose or evil motive."   Legislative history does not suggest that the defendant must know of the specific statute that he is violating--only that he knows of the legal duty (the duty to support the child) that he is violating.

    6.      Defendant Has A Long-Term Child Support Delinquency

    The legislative history of the predecessor statute, the Child Support Recovery Act of 1992 (CSRA), suggests that Congress sought to remedy the problems of long-term child-support payment delinquency created by those who continually evade court processes.   In addition, the Fifth Circuit noted that the majority of courts to address the nature of § 228 concluded that it is a continuing offense, and that state courts routinely hold that state statutes criminalizing the willful

11

1   failure to meet child-support obligations create continuing offenses.

2          Defendant violated URESA, the predecessor statute to the CSRA.  Defendant has a

3   continuous long-term child support payment delinquency going back to July 5, 1976, when he

4   abandoned JG with the plaintiff.

5          7.      Defendant Knew That His Conduct Was Unlawful

6

7          In most tax cases, the government must prove that the defendant knew the facts that

8   constitute the offense and that his conduct was unlawful, but it need not prove that he knew that he

9   was violating a specific statute to prove a willful violation. The district court required that the

10  government prove that Bell violated his known legal duty to pay child support.  The court

11  instructed the jury: An act is done willfully if it is done voluntarily and intentionally with the

12  purpose of avoiding a known duty under a state court order to pay a child support obligation.

13  (United States v. Bell, 09-2555 (7th Cir. 2010))

14

15         8.      Defendant Always Had The Means To Support JG

16         In determining whether the defendant acted willfully in failing to pay support, the

17  Court must consider whether the defendant had the ability to pay some portion of the past due child

18  support obligation.  The only way to determine defendant's ability to pay, is compel production of

19  his Federal Tax Returns and financial records.  Plaintiff intends to compel production of all of

20  defendant's financial records and tax statements for the years 1976 until 1989.  This could easily be

21  accomplished by officers of the court, and by Federal and State child support investigators, but as

22  stated before, they refused to proceed against the defendant.  Defendant always had the means to

23  support JG.   Defendant enrolled Melinda and her children in his Federal Dependent Benefits, and

24  supported them completely for 12 years, while he could only pay $100.00 a month to the welfare

25  office.

26

27         The last time defendant saw JG, she was 7 years old.  He did not call or write, or send

28                                                12

gifts, or include JG in holidays and family vacations.  When plaintiff told investigators the

defendant had never paid child support, they "assumed" wrongly, that the defendant had an ongoing

relationship with JG, just as any other father.   Investigators refused to even listen to the plaintiff.

Defendant drew their attention away from the plaintiff, and discouraged them from really

investigating the circumstances.

    9.  Defendant Violated The Deadbeat Parent's Punishment Act ("DPPA")

    The Statute of Limitations for child support matters in the State of Maryland, is 12

years.   JG's reached age 18 in 1989.  Defendant's statutory period expired in 2001, after which he

began living openly.  However, willful failure to pay a past due child support obligation is a

continuing offense.  Defendant is currently in violation of the DPPA.

    Examples of sentencing guidelines for willful violation to pay child support appear in

United States v. David Blackburn, 2000 DSD 31, District of South Dakota, Southern Division, CIV

99-40135; United States v. Bell, 09-2555 (7th Cir. 2010); "Failure to Pay Child Support is a

Continuing Offense. . . . 18 U.S.C. § 228 is a continuing offense. Ignorance of This Law is No

Excuse and Double Counting". (Deadbeat Parents Punishment Act - 18 USC 228);  "If a criminal

statute contains no explicit statute of limitations, the generic, federal five-year statute applies". See

18 U.S.C. § 3282(a).   Violation of 18 U.S.C. § 228 is a continuing offense and is not completed

until the offense expires. See United States v. Yashar, 166 F.3d 873, 875-76 (7th Cir. 1999); United

States v. Edelkind, 525 F.3d 388, 393-95 (5th Cir.), cert. denied, 129 S. Ct. 246 (2008).

    10.  Defendant Had An Ongoing Duty to Provide Current Financial Information

    In Shafmaster v. Shafmaster, 642 A.2d 1361 (N.H. 1994), the court concluded that in a

divorce case, "once financial information was requested and provided, the defendant had an

ongoing obligation to provide current and accurate financial information."

/ / /

13

CIVIL NO: 11-CV-143-8-PHX-SRB

11.   Plaintiff Was Denied A Right To Due Process and Equal Protection

Just prior to filing this action, on May 22, 2011, Station KPHO TV in Phoenix ran the following story:

"Kathi Smith-Petersen, 59, was owed tens of thousands of dollars in child support payments dating back to 1976.  More than 30 years ago, her ex-husband left her with two young daughters and a baby on the way.  This week, Arizona Department of Economic Security (DES) presented her with a check for $93,639.

Kathi also got to meet the workers who found out that her ex-husband had an out-of-state bank account with more than $200,000. Workers said they placed a levy on it and forced the bank to surrender the $93,639. Workers said Kathi's ex-husband owed about $27,000 in child support. The interest that accrued totaled about $67,000.
http://www.kpho.com/news/27959500/detail.html

Kathi and the plaintiff both have the same extreme circumstances, beginning at almost the same time.  Plaintiff asked the same DES office to assist her in collecting her past-due child support, but they insisted that plaintiff needed a valid order for support.   DES officers were able to garnish her husband's bank accounts, because her husband's name appeared on the Federal database listing his financial information.   Plaintiff does not have a child support order, because officers of the court refused to examine him.  Defendant's name and financial information does not appear on any Federal database.

On February 27, 1995, President Clinton signed Executive Order 12953, establishing the Federal government as a model employer for facilitating the enforcement of child support orders.   NSA became the designated Federal agency to maintain the Federal Parent Locator Service and the Child Support Enforcement Network.   NSA employees, however, were specifically excluded from that network, at the request of the Director of the NSA:

"From the Federal Office of Child Support Enforcement: DCL-05-27 FPLS Minor Release 05-02:  In September 2005, the Federal Office of Child Support Enforcement (OCSE) will implement Federal Parent Locator Service (FPLS) Release 05-02. This release includes enhancements to the Federal Case Registry (FCR), the Child Support Enforcement Network (CSENet), and the Federal Offset System. *Establish an Interface with the National Security Agency (NSA) as an Additional Locate Source for Child Support Agencies*. This locate source will

14

1   provide states with employment data for those NSA employees for whom information release is

2   authorized. *NSA by law is exempt from NDNH reporting requirements.*"

3        Although has a past due child support obligation, his name and his information does

4   not appear on any Federal child support database.  Defendant is set aside in a separate class of

5   Federal employees, and offered special treatment, where no real issue of national security exists.

6   Presidential Order 12953 bars ordinary civil discovery to the plaintiff.  The Executive Branch, in

7   that regard, becomes an unwitting accessory to Fraud.   Presidential Order 12953 violates plaintiff's

8   rights to Due Process and Equal Protection of the law.

9

10       The Federal Parent Locator Service, 42 U.S.C. 653, also contains an ambiguous

11  exclusion for "national security":

12       b) Disclosure of information to <u>authorized persons</u> (2) No information shall be disclosed
    to any person if the disclosure of such information would contravene <u>the national policy or security</u>

13  <u>interests of the United States</u> or the confidentiality of census data.

14

15       Under this statute, the defendant's information becomes "classified".  Plaintiff isn't

16  "authorized" to know his information, violating plaintiff's rights to due process and equal

17  protection of the law again.   Plaintiff was excluded from the 1987 proceedings, only to discover the

18  file 30 years later.   In order to enforce a child support order against the defendant, plaintiff needs

19  the full and complete cooperation of the State and Federal government.   42 U.S.C. 653 acts as a bar

20  to civil discovery, and sets the defendant in a separate class of Federal employees.   Defendant's

21  past due child support obligation has nothing whatsoever to do with the "national policy or security

22  interests of the United States", and is ambiguous, vague, and unintelligible, and is Void for

23

24  Vagueness.

25       Under the National Security Act of 1947:

26       . . .(5) The terms "national intelligence" and "intelligence related to national

27  security" refer to all intelligence, regardless of the source from which derived and including
    information gathered within or outside the United States, that—

28                                                                      15

1   . . .(A) pertains, as determined consistent with any guidance issued by the President, to

2   more than one United States Government agency; and (B) that involves, (i) threats to the United

3   States, its people, property, or interests; (ii) the development, proliferation, or use of weapons of
mass destruction; or (iii) any other matter bearing on United States national or homeland security.
"

4

5   The National Security Act of 1947 established the Office of the Director of

6   National Security. ("ODNI") Defendant's employment at the NSA is at the discretion

7
8   of the Director of National Intelligence.  The ODNI maintains a searchable database

9   available for review at  http://odni.gov/reports/IC_Legal_Ref_2009.pdf    The term

10  "child support" produces no results.  Defendant's child support has nothing at all to do

11  with "national security."

12  In his book, *Body of Secrets*, James Bamford describes the NSA's work

13
14  environment as "a steel and cement no-mans-land" and "Crypto City."  Bamford

15  states, *"Most will live and die never having told their spouses exactly what they do."*

16  There's a big difference between telling your spouse what you do at the NSA, *vs.*

17  concealing your Federal employment and refusing to pay child support.  How else

18  could plaintiff obtain an enforceable order for support without having the defendant's

19
20  total cooperation?

21  The NSA and the Department of Defense assert a cause for "national

22  security" that simply does not exist.  There is very little enthusiasm on the part of the

23  Federal government to insure the plaintiff's Constitutional rights, or her rights to

24  child support.

25  42 U.S.C. 653 as written, does not set out any civil procedure, and presents

26
27  another bar to discovery.  The term "national policy or security interests of the United

28                                          16

States" is ambiguous, vague, and unintelligible, and violates of plaintiff's rights to due process and equal protection.   How else can plaintiff obtain a valid order for support, if the Federal government puts down obstacles to discovery on the plaintiff, but not on other Federal employees?   How can the plaintiff pursue any remedy at law without the full cooperation of the Federal government?  Instead, plaintiff is told *"his employer refused to cooperate."*

The term "national security" is vague and unintelligible, and has no meaning.  Harvard History professor, Charles Maier's definition of national security in 1990, was "a capacity to control those domestic and foreign conditions that the public opinion of a given community believes necessary to enjoy its own self-determination or autonomy, prosperity, and well being."

The U.S. Armed Forces defines national security as:

*"A collective term encompassing both national defense and foreign relations of the United States. Specifically, the condition provided by: a. a military or defense advantage over any foreign nation or group of nations; b. a favorable foreign relations position; or c. a defense posture capable of successfully resisting hostile or destructive action from within or without, overt or covert."*

In 2010, President Obama gave a broader definition:

*"The security of the United States, its citizens, and U.S. allies and partners; a strong, innovative, and growing U.S. economy in an open international economic system that promotes opportunity and prosperity; respect for universal values at home and around the world; and an international order advanced by U.S. leadership that promotes peace, security, and opportunity through stronger cooperation to meet global challenges.*

In any matter of "national security", the Foreign Intelligence Surveillance Court takes jurisdiction. The Rules for the Court are under the supervision of Hon. John D. Bates, Presiding:

17

"Foreign Intelligence Surveillance Court supersede both the February 17, 2006 *Rules of Procedure* and the May 5, 2006 *Procedures for Review of Petitions Filed Pursuant to Section 501(f) of the Foreign Intelligence Surveillance Act of 1978, As Amended* These revised *Rules of Procedure* are effective immediately. John D. Bates Presiding Judge Foreign Intelligence Surveillance Court."

The Office of the Director of National Intelligence ("DNI") makes the final determination in matters of "national security". The detail information defining "national security" comes directly from the DNI:

"SEC. 3. [50 U.S.C. §401a] As used in this Act: (1) The term "intelligence" includes foreign intelligence and counterintelligence. (2) The term "foreign intelligence" means information relating to the capabilities, intentions, or activities of foreign governments or elements thereof, foreign organizations, or foreign persons, or international terrorist activities. . ."

   12.   Defendant's Salary and Benefits Are Maintained At the Office of Management and Budget ("OMB")

Defendant's salary and benefits information were always easily confirmed by the Office of Management at Budget ("OMB"), within the Office of the President:

". . .3132(a)(2) "Senior Executive Service position" means any position in an agency which is classified above GS-15 pursuant to section 5108 or in level IV or V of the Executive Schedule, or an equivalent position . . ."

Defendant's rate of pay is established under 5 U.S.C. Sec. 5382:

"(a) Subject to regulations prescribed by the Office of Personnel Management, there shall be established a range of rates of basic pay for the Senior Executive Service, and each senior executive shall be paid at one of the rates within the range, based on individual performance, contribution to the agency's performance, or both, as determined under a rigorous performance management system. The lowest rate of the range shall not be less than the minimum rate of basic pay payable under section 5376 and the highest rate, for any position under the system or an equivalent system as determined by the President's Pay Agent designated under Section 5304(d) shall not exceed the rate for level III of the Executive Schedule . . ."

Section 5384: Performance Awards In the Senior Executive Service

(a)(1) To encourage excellence in performance by career appoint appointees, performance awards shall be paid to career appointees in accordance with the provisions of this section. (2) Such awards shall be paid in a lump sum and shall be in addition to the basic pay paid under section 5382 of title 5 USCS 5382, or 4507. . .

18

1

2     (3) The aggregate amount of performance awards paid under this section by an agency during any fiscal year may not exceed the greater of (A) an amount equal to 10 percent of the aggregate amount of basic pay paid to career appointees in such agency during the preceding fiscal year, or; (B) an amount equal to 20 percent of the average of the annual rates of basic pay to career appointees in such agency during the preceding fiscal year. . .

3

4

5     (d)  The Office of Personnel Management may issue guidance to agencies concerning the proportion of Senior Executive Service salary expenses that may be appropriately applied to payment of performance awards and the distribution of awards.

6

7     Section 5392:

8

9     . . . (c) In establishing special occupational pay systems, the pay agent shall – publish a proposed plan for determining the pay of such employees in the Federal Register.

10

11

12     13.    Plaintiff Was Defrauded Out of Federal Dependent Benefits for JG

13     Plaintiff paid "out of pocket" for JG's medical and dental, and associated health costs.

14     Defendant failed to stay in contact, or determine if JG was covered by health insurance.  Defendant

15     did not have an option to enroll JG in his Federal Dependent Benefits.  The Child Support

16     Enforcement Act and the Employee Retirement Income Security Act of 1974 (ERISA), was enacted

17     when JG was three (3) years old.  Defendant was mandated by ERISA to enroll JG, but refused.

18     (Pub.L. 93-406, 88 Stat. 829, enacted September 2, 1974)

19     Congress took additional steps to clarify mandatory compliance in 1974. Defendant did

20     not have an option to enroll his Federal dependent benefits to JG.  Defendant attended orientation

21     meetings at the NSA, where his duty to enroll his dependent children was thoroughly explained.

22

23     ERISA was enacted to protect the interests of employee benefit plan participants and

24     their beneficiaries, by requiring the disclosure to them of financial and other information concerning

25     the plan; by establishing standards of conduct for plan fiduciaries; and by providing for appropriate

26     remedies and access to the Federal courts.

27     Defendant's Order for dependent benefits was a separate provision of child support

28                                                    19

1    orders.  In refusing to appear in child support examinations, defendant violated ERISA.  An Order

2    for dependent benefits from a domestic relations court, must comply with the provisions set forth in

3    ERISA.    Plaintiff has no order for ERISA benefits, or child support.  Officers of the court in

4    Maryland, who routinely examine Federal employees for child support, were aware of the ERISA

5    requirements, but denied Federal benefits to JG, ie.,:

6

7                    The Employee Retirement Income Security Act of 1974, or ERISA

8    http://www.dol.gov/ebsa/faqs/faq_compliance_pension.html)

9

10       "When a plan receives a domestic relations order purporting to divide pension benefits, it
     must first determine whether the order is a qualified domestic relations order (QDRO).  The order
11   must relate to child support, alimony, or marital property rights and be made under state domestic
     relations law.  To be qualified, the order should clearly specify the name and last known mailing
12   address and the name and last address of each alternate payee.  It also must state the name of the
     plan; the amount or percentage - or the method of determining the amount or percentage - of the
13   benefit to be paid to the alternate payee; and the number of payments or time period to which the
     order applies.  The order cannot provide a type or form of benefit not otherwise provided under the
14   plan and cannot require the plan to provide an actuarially increased benefit.  And if an earlier QDRO
     applies to the benefit, the earlier QDRO takes precedence over a later one.
15
         In certain situations, a QDRO may provide that payment is to be made to an alternate
16   payee before the participant is entitled to receive their benefit.  For example, if the participant is still
     employed, a QDRO could require payment to an alternate payee to begin on or after their earliest
17   retirement age, whether or not the plan would allow you to receive benefits at that time."

18              14.    Defendant Concealed At Least Three Additional Dependents

19            Defendant adopted Melinda's 3 children, but refused to provide support for JG.        In

20   1987, defendant feared production of his Federal tax returns by the District Attorney's office,

21   knowing that they would question him about his numerous dependents, and his failure to support

22   JG.  JG is defendant's only natural child.  The State of Maryland maintains the following

23
     guidelines for the disposition of defendant's estate:
24

25          "The first thing that must be done is the filing of the will with the Register of Wills in
     the County where the decedent was domiciled, even if it is not to be offered for probate.
26

27          If there are any assets, the personal representative must then properly prepare and file
     a petition for probate and associated forms with the Court, at the same above location as filing
28
                                            20

                                    CIVIL NO: 11-CV-143-8-PHX-SRB

the will.

After appointment, the Personal Representative then:

(1)  determines the kind, amount, and location of all assets of the decedent and where feasible bring them into the Personal Representative's possession in a proper estate bank account,

(2)  determine the whereabouts of all of the decedent's heirs and legatees, and make reasonable efforts to identify creditors of the decedent;"

Defendants have no intention of contacting JG in the event of defendant's death.   If defendant had died when JG was a minor, plaintiff would have been appointed guardian ad litem.   Melinda Grimaud intends to defraud JG, and divert any proceeds from the defendant's estate to her own children, giving rise to a question of probate fraud.

15.   JG Was Denied NSA Educational Benefits

JG dropped out of high school, but enrolled in community college in 1991.   She took out Federal student loans and plaintiff paid the additional costs.   The NSA explains their educational benefits on their website.   JG was denied scholarship opportunities and low interest loans that were easily provided by the defendant:

http://www.nsa.gov/commitment/community/index.shtml

We run educational outreach programs and have many educational partnerships that include a special emphasis on promoting mathematics and science education. Our Stokes Educational Scholarship Program is a unique opportunity for high school seniors planning to study computer science or computer or electrical engineering, and for college sophomores studying certain foreign languages, math, or other fields leading to a career in intelligence analysis. We also donate excess computers and laboratory equipment to non-profit educational institutions to support mathematics and science education.

NSA has strong ties to the Maryland business community and industry base including numerous local and regional partners, from area chambers of commerce to a special BWI Business Partnership. The NSA Office of Small Business Programs aids, counsels, assists, and protects the interests of small businesses. The NSA Acquisition Organization is committed to a variety of outreach initiatives to establish partnerships with industry, academia, and other local, state, and federal government entities.

**FRAUD UPON THE COURT** [60(d)(1),(3)]

21

1.    Plaintiff Is Bringing An Independent Action

Plaintiff is bringing an independent action to devitalize child support proceedings that took place in Prince Georges' County MD, in 1987.   There is no time limit on an independent action claiming Fraud upon the Courts. (7 Moore's Federal Practice, 2d ed., p. 512, ¶ 60.23.)

2.    Officers of the Court Engaged In Fraud Upon the Court

The District Attorney of Pima County brought a timely action for past due child support, in 1987, in Prince Georges' County MD.   Officers of the court knew the defendant worked for the Federal government, but refused to examine him for his fitness to pay child support.   The DA apologized to the plaintiff later, saying: *"His employer refused to cooperate.  He offered to pay $260.00 a month.  You should probably take the money because something is better than nothing."*

3.    Defendant Obtained A Fraudulent Agreement for $260.00

Defendant obtained a fraudulent agreement for child support in an amount of $260.00 a month, while officers of the court concealed his Federal employment from the plaintiff.   Plaintiff discovered the defendant's Federal employment by accident and mistake, and recovered the District Attorney's files from the Pima County Archives.   Plaintiff read a record of the proceedings, where defendant's employer is clearly identified as the NSA, an Agency of the Federal government.

4.    Plaintiff Seeks To Devitalize the Agreement for $260.00

Plaintiff seeks to restore the parties to their original condition, where defendant can be thoroughly examined, and plaintiff can obtain an enforceable order for support.

5.    Officers of the Court Refused To Examine the Defendant

Officers of the Court in Maryland, who routinely examine Federal employees for child support, were well aware that defendant's salary and benefits were routinely confirmed the Office of Personnel Management ("OPM"), or the Office of Management and Budget ("OMB").

Officers of the court refused to examine the defendant, and negotiated settlements in

22

CIVIL NO: 11-CV-143-8-PHX-SRB

lieu of his appearance, without the plaintiff's knowledge or consent.   Plaintiff was held at a duress

to accept sums far less than she was entitled to receive by officers of the court, and denied an

adequate remedy at law.   Under any other circumstances, they would have compelled his

examination, like any other defendant. Plaintiff would have received a substantial order for child

support and Federal dependent benefits for JG.

Plaintiff declared bankruptcy, which damaged her credit for next ten years.   Defendant,

however, went on to accrue a lifetime of earnings, assets, real property, investments, 401k, and a

generous Federal retirement package.

6.   Defendant Had A Past-Due Child Support Obligation

The District Attorney of Pima County filed a timely Complaint under the Revised

Uniform Reciprocal Enforcement of Support Act, Action No. R24933, in the Superior Court of the

State of Arizona, County of Pima, on September 3, 1987.   The DA agreed to represent the plaintiff

as an individual, seeking a child support order from the Defendant.   An Affidavit of Arrears was

included in the Complaint, showing defendant had failed to make a payment of $100.00 in July

1987, and it was due and owing.

Defendant's payment history was $100.00 a month, beginning ten years before, on May

18, 1977, by order of the Superior Court of the State of California, County of Sacramento, Case

Number 726275, Complaint for Reimbursement and Support Under The Uniform Reciprocal

Enforcement of Support Act.  Defendant continued to make $100.00 a month payments, on an old

welfare order arising from Sacramento County, for 10 years, while he held down career placement

with the NSA.

On page 2 of that Complaint, it states as follows:

"That defendant, or about the 6th day of April, 1977, and subsequent thereto, had refused

and neglected and still does refuse and neglect to provide fair and reasonable support for the

23

CIVIL NO: 11-CV-143-8-PHX-SRB

dependent named herein, according to his means and earning capacity; that the total amount to which defendant has contributed to said named dependent since said date is approximately $75.00."

Defendant paid a total of $75.00 over a 9 month period, from the date of the parties' separation on July 5, 1976, until April 6, 1977.   Defendant was in the middle of his application period with the NSA, and had already received his incentive package.  Plaintiff was working full time, and supplementing her income with welfare and food stamps, while the defendant was living with Melinda and supporting her children.   Defendant concealed his information and his earnings from welfare authorities, then continued to send checks for $100.00 a month for the next ten years, from Washington DC, never telling them he worked for the Federal government.

7.    An Independent Action Will Relieve the Plaintiff of the Proceedings

An independent action in equity will relieve the plaintiff of any "judgment, order, or proceeding" on a finding of Fraud.

"Where a lawyer engages in a conspiracy to commit a fraud upon the court by the production of fabricated evidence and by such means obtains a judgment then the enforcement of the judgment becomes manifestly unconscionable' and **a court of equity may devitalize the judgment." Id, at 288.** Sutter v. Easterly (Mo) 189 SW2d 284.

Plaintiff's independent action is supported by FRCP 60(b), Substantive Error.  Plaintiff discovered the truth by mistake and inadvertence, that even with reasonable diligence, could not have been discovered in time to move for a new trial.  Plaintiff discovered the defendant's Federal employment by electronic means.   Discovery of information was limited to only that information available on the Internet:

"(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: a. mistake, inadvertence, surprise, or excusable neglect; b. newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); c. fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

24

1

2          This rule does not limit the power of a court to entertain *an independent action* to relieve
   a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually

3    personally notified as provided in Title 28, U.S.C., §1655, or to set aside a judgment for fraud upon
   the court."

4

5                  9.      Plaintiff Has Grounds To Reopen A Case

6    Plaintiff has a good defense to the cause of action on which the judgment is founded;
   Plaintiff was prevented by fraud from obtaining the benefit of its defense;

7    Plaintiff was not at fault or negligent;
   Plaintiff has no adequate remedy at law.

8

9                  10.     Defendant is a "Bivens Defendant"

10          In the defendant's case, there are additional problem of Obstruction of Justice co-

11   mingled with Fraud Upon the Court, where a Federal Agent knew he had a duty to cooperate in child

12   support examinations, but acted to prevent the State Courts from telling the plaintiff he worked for

13   the Federal government.   The Congressional Research Service provided the best analysis of the

14

15   Obstruction of Justice Statutes, including:

16   *". . .United States  CRS-20  As to the first two elements, the Supreme Court has maintained for over
   a century that "a person is not sufficiently charged with obstructing or impeding the due*

17   *administration of justice in a court unless it appears that he knew or had notice that justice was
   being administered in such court. . ."*

18
   *. . .Contempt*
19   ***Criminal Contempt of Court.***
   *The final and oldest of the general obstruction provisions is contempt. . . The first Congress*

20   *empowered the federal courts "to punish by fine or imprisonment, at the discretion of said courts,
   all contempts of authority in any cause or hearing.. . ."*

21   T

22   **SECOND CAUSE OF ACTION**

23   **ABUSE OF PROCESS**

24

25                  1.      Plaintiff Had A Duty To Report the Defendant

26          Plaintiff had a duty to report the defendant to the Department of Defense.  Plaintiff had

27   information about the defendant's past, that was entirely unknown to the Department of Defense.

28                                          25

1    Plaintiff was never included in any of defendant's routine background checks, but had detrimental

2    information about his unauthorized contact with foreign intelligence.  The Federal government, in

3    fact, maintains an informational website for the public, on how to report suspicious activities.

4    However, when plaintiff reported her information, defense investigators were confused about her

5    identity, and had no record of her marriage to the defendant.

6

7          After investigators realized that the plaintiff had been excluded from his background

8    checks, they asked her to sign confidentiality agreements, and cooperate in an investigation.

9    Defendant was tipped-off that plaintiff was speaking to investigators about his past.   When

10   investigators failed to contact her, as promised, she contacted the FBI.   FBI agents visited her

11   home, but refused to take her information.    Plaintiff had no other alternative, than to confront the

12   defendant.

13

14         Defendant set the tone of their relationship during their marriage.  None of the hostilities

15   that existed, were ever resolved.  Defendant became enraged whenever the plaintiff asked for

16   money, and hung up the phone, placing fear in the plaintiff.   The same circumstances existed

17   during their marriage.  Defendant abused alcohol, and bullied the plaintiff, and became enraged

18   when she tried to reason with him.  The marriage ended when the defendant locked the plaintiff in

19   their apartment, and threatened suicide.

20         2.    Defendant Requested that Plaintiff Be Barred From Washington DC.

21

22         Plaintiff had no other recourse than to call the defendant at his home, and confront him

23   directly.  Defendant hung up the phone on hearing her voice, and recorded her calls, inciting her to

24   place angry calls to his home phone.  When plaintiff threatened to come to Washington DC in

25   person, defendant took out a domestic violence restraining order alleging he was harassed, and that

26   plaintiff had sent "death threats" to his *employer*.  The Maryland Court barred the plaintiff from the

27   entire jurisdiction of Washington DC, at the defendant's handwritten request.   Case Number

28                                                    26

0701SP014302008, District Court of Maryland, April 15, 2008.

 3.    Defendant Attempted to Blackmail the Plaintiff

Plaintiff retained attorney Laurie M. Wasserman, of Tydings & Rosenberg, LLP, Baltimore, on her suggestion that she could call the defendant and arrive at a reasonable solution. Defendant was not interested in any reasonable solutions.  Defendant dictated the terms of another private agreement, where defendant would drop his restraining order, if plaintiff would stop contacting the Department of Defense, in part:

 ". . .3. Sharon will cease any and all contact with Steven's employer.  This includes, but is not limited to, the National Security Agency and the Department of Defense, and its employees.

 4. Sharon will cease any and all contact with the Central Intelligence Agency, although Steven is not affiliated with them. . ."

Wasserman explained that the agreement had no real meritorious value, but it would *"make him happy"*.  Plaintiff has grown tired of appeasing the defendant and making the defendant *"happy"*. Plaintiff fired her attorney and refused to sign.

Defendant continued with his order, knowing he was preventing the plaintiff from seeking redress directly from the Federal government, under threat of arrest for violating a restraining order.

Although the order expired in May 2009, it still remains a permanent criminal record, where it is included on any credit report, employment application, or where any criminal history is required.

 4.    Officers of the Court Destroyed and Tampered With Electronic Records

Plaintiff hired a private detective, who advised her that all of her child support records had been destroyed, and that her name had been deleted where it appeared alongside the defendant. JG's name was missing entirely.  Plaintiff was informed that someone had tampered with the

CIVIL NO: 11-CV-143-8-PHX-SRB

1   electronic records.

2         5.    Plaintiff Was Detained By Federal Officers

3         Plaintiff was also advised by both her attorney, and her private detective, not to travel to

4

5   or enter the Federal jurisdiction of Washington DC, and that her name had been placed on a Federal

6   database, instructing Federal officers to detain her on suspicion of violating a restraining order.

7   Plaintiff was detained a month later by Federal officers in Vancouver BC, while on vacation with

8   her daughter, Ann Hodges, 3000 miles from Maryland.   Both the plaintiff and Ann had their

9   passports seized, and their car and passports taken from them.   Federal officers telephoned the

10  defendant, asking what recourse they should take.   Plaintiff and her daughter were released an hour

11  later with no explanation.

12        6.    Defendant Continues to Issue Veiled Threats

13        Defendant continues with his veiled threats if she attempts to contact investigators, or

14

15  pursue redress with the Federal government.   Plaintiff received threats from defendant's adopted

16  son Mike Grimaud, and a threat from a local attorney and personal friend of the defendant,

17  threatening to call the "authorities."   Evidence of those threats, are included in Plaintiff's Exhibits.

18        7.    Plaintiff's Rights to Redress and Due Process Were Violated

19        Clearly, the Maryland court exceeded its jurisdiction.   The defendant made the request

20  that the plaintiff be barred from Washington DC, in his own handwriting.   The Maryland court has

21  no jurisdiction over Washington DC, and cannot interfere with plaintiff's rights to redress the

22  Federal government.

23        8.    Defendant was Acting In His Official Capacity  (Bivens)

24

25        The Supreme Court created a private damages action against federal officials for

26  constitutional torts (civil rights violations), which are not covered by the FTCA. Since a Bivens

27  action is brought against a federal official in the official's personal capacity, it is not considered to

28                         28

be an action against the United States and therefore is not barred by sovereign immunity. Bivens is not a general tort law. The plaintiff seeking a damages remedy under Bivens must first demonstrate that constitutional rights have been violated.[Davis v. Passman, 442 U.S. 228 (1979) ]

Bivens suits have been acknowledged by the Court as having more of a deterrence effect against federal officials from committing constitutional torts than the FTCA. This is chiefly because a Bivens suit is a personal suit against the official, and punitive damages are recoverable. A Bivens defendant is at risk of personal liability, including punitive damages.

The main defense for a federal official in a Bivens action is official immunity from actions for damages.   There are two types of official immunity available as affirmative defenses: absolute and qualified. [Butz v. Economou, 438 U.S. 478 (1978)] Absolute immunity is granted to judges, prosecutors, legislators, and the President, so long as they are acting within the scope of their duties. Qualified immunity applies to federal officials and agents who perform discretionary functions, but may be overcome by a showing that their conduct violated a constitutional right.[Harlow v. Fitzgerald, 457 U.S. 800 (1982)]

9.    Plaintiff Is A Federal Informant

In coming forward and offering information about the defendant, and signing confidentiality agreements, the plaintiff is for all purposes, a protected by Federal law.  Title 18, part 1, chapter 73 §1513 and it's actionable counterpart, §1514, for restraining orders for harassing a Federal witness:

*1513. Retaliating against a witness, victim, or an informant*

*(b) Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for—*
*(1) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or*
*(2) any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial*

29

CIVIL NO: 11-CV-143-8-PHX-SRB

1  *proceedings given by a person to a law enforcement officer; or attempts to do so, shall be fined
   under this title or imprisoned not more than 20 years, or both.*
2  ***(c)*** *If the retaliation occurred because of attendance at or testimony in a criminal case, the
   maximum term of imprisonment which may be imposed for the offense under this section shall be
3  the higher of that otherwise provided by law or the maximum term that could have been imposed
   for any offense charged in such case. . ."   (and)*
4

5  ***Congressional Research Service: Obstruction of Justice: an Overview of Some of the Federal
   Statutes that Prohibit Interference with Judicial, Executive, or Legislative Activities***
6  ***December 27, 2007***
   *Charles Doyle Senior Specialist American Law Division*
7  *Order Code RL34303*

8  *Obstruction of Justice: An Overview of Some of the Federal Statutes that Prohibit Interference with
   Judicial, Executive, or Legislative Activities . . .*
9
   *"Obstruction of justice is the impediment of governmental activities. There are a host of federal
10 criminal laws that prohibit obstructions of justice. The six most general outlaw obstruction of
   judicial proceedings (18 U.S.C. 1503), witness tampering (18 U.S.C. 1512), witness retaliation (18
11 U.S.C. 1513), obstruction of Congressional or administrative proceedings (18 U.S.C. 1505),
   conspiracy to defraud the United States (18 U.S.C. 371), and contempt (a creature of statute, rule
12 and common law).*
   *The laws that supplement, and sometimes mirror, the basic six tend to proscribe a particular means
13 of obstruction. Some, like the perjury and false statement statutes, condemn obstruction by lies and
   deception. Others, like the bribery, mail fraud, and wire fraud statutes, prohibit obstruction by
14 corruption. Some outlaw the use of violence as a means of obstruction. Still others ban the
   destruction of evidence. A few simply punish "tipping off" those who are the targets of an
15 investigation.*

16              Defendant offered to drop his restraining order if plaintiff would stop contacting the

17 Department of Defense and the CIA:

18 ***Obstruction by intimidation, threats, persuasion, or deception (18 U.S.C. 1512(b).***
   *The second group of offenses within Section 1512 outlaws obstruction of federal Congressional,
19 judicial, or administrative activities by intimidation, threat, corrupt persuasion or deception, 18
   U.S.C. 1512(b). Parsed to its elements, it provides that:*
20 *I. Whoever II. knowingly*
   *A. uses intimidation B. threatens, or C. corruptly persuades another person, or D. attempts to do
21 so, or E. 1. engages in misleading conduct53*
   *2. toward another person, III. with intent to*
22 *A. 1. a. influence, b. delay, or*
   *c. prevent 2. the testimony of any person 3. in an official proceeding,54 or*
23 *to the penalty imposed for the underlying crime of violence, 18 U.S.C. 924(c)(1). In United States v.
   Harris, 498 F.3d 278 (4th Cir. 2007), the Fourth Circuit upheld a conviction for violating
24 subsections 1512(a) and 924(c) in connection with the firebombing of a witness's home (for
   purposes of 924(c) a firearm includes explosive or incendiary devices, 18 U.S.C. 921(a)(3),(4)).
25 51Offenders face a term of imprisonment of not less than 5 years in addition to the penalty imposed
   for the underlying crime of violence, 18 U.S.C. 929(a)(1).  Offenders face a term of imprisonment
26 of not more than 20 years, 18 U.S.C. 1028(b)(3). . .*

27 *. . . §1512(b)(3) requires only the possible existence of a federal crime and a defendant's intention*

28                                          30

1    *to thwart an inquire into that crime. Veal, 153 F.3d at 11250. As we explained in Veal, §1512(b)(3)*
2    *criminalizes the transfer of misleading information which actually relates to a potential federal*
*offense . . .Veal, 153 F.3d at 1252 (emphasis in the original); cf., United States v. Byrne, 435 F.3d*
3    *16, (1st Cir. 2006)("If the CRS-15 obstruction offense prosecution, however, does require proof*
*that "the offense in question was actually a federal offense and that the defendant believed that the*
*witness – toward whom the defendant engaged in [intimidating, threatening, corruptly persuasive*
4    *or] misleading conduct – might communicate with federal authorities."63 The defendant's belief*
*that witness might confer with federal authorities can be inferred from the nature of the offense and*
5    *"additional appropriate evidence."*

6    ***Obstruction of Justice by "Tip-Off"***
*Although an individual who obstructs a federal investigation by tipping off the targets of the*
7    *investigation is likely to incur liability either as a principal under 18*
*422 UnitedStatesv.Johnson,485F.3d1264,1270(11thCir.2007); UnitedStatesv.McBane, 433 F.3d*
8    *344, 350 (3d Cir. 2005); United States v. Stewart, 433 F.3d 273, 318 (2d Cir. 2006); United States*
*v. Mitchell, 388 F.3d 1139, 1143 (8th Cir. 2004); United States v. Finn, 375 F.3d 1033, 1038 (10th*
9    *Cir. 2004).423 United States v. McBane, 433 F.3d 344, 350 (3d Cir. 2005), quoting, United States*
*v. Gaudin, 515 U.S. 506, 512 (1995); United States v. Stewart, 420 F.3d 1007, 1019 (9th Cir.*
10    *2005); United States v. Mitchell, 388 F.3d 1139, 1143 (8th Cir. 2004); United States v. Hasner, 340*
*F.3d 1261, 1273-274 (11th Cir. 2003).*

11

12          Defendant took out a retaliatory restraining order against the plaintiff to keep her from

13   traveling to the nation's capital and seeking redress directly from the Federal government.  In doing

14   so, defendant violated the plaintiff's First Amendment rights to due process and the right to redress

15   the government.

16          Plaintiff was not harassing the defendant, or threatening his life.  Plaintiff was finally

17   confronting the defendant for actions, where officers of the court, and State and Federal

18   investigators, refused to proceed.   Defendant could have just as easily answered the phone and

19   resolved the conflict.  If defendant had a reasonable explanation for his failure to pay child support,

20

21   and see JG, he would have given it.  Instead he tape recorded the plaintiff's calls, and took out

22   restraining orders.   Defendant worried that plaintiff's information would eventually destroy his

23   career at the NSA.

24          Defendant was an aspiring political candidate, well known in the Republican Party, and

25   in Congress.  Defendant received a favorable appointment from President G.W. Bush, and a

26   recommendation from the Secretary of Defense.  Defendant was confirmed by the Senate.

27

28

<center>31</center>

Plaintiff's arrival, 35 years after the fact, posed a significant threat to defendant's political career.

        10.   Defendant's Restraining Order Was Without Grounds

        Defendant's restraining order was malicious, and without grounds.  Defendant utilized the above-described restraining order to threaten, intimidate, and harass the plaintiff, and her family, whenever she entered into any Federally controlled jurisdiction.

        The First Amendment forbids a State from interfering with the Due Process guarantees of the First Amendment.  A vague order from a State court, also prevents a citizen from realizing when he or she is entering an area of risk for criminal sanctions.  The restraining order, in this case, was vague and unintelligible, and overbroad.  Barring the plaintiff from Washington DC, implicated a host of Federal jurisdictions and Constitutional violations.  A doctrine derived from the Due Process clauses of the Fifth and Fourteenth amendments to the U.S. Constitution that requires criminal laws and orders have to be drafted in language that is clear enough for the average person to comprehend.   If a person of ordinary intelligence cannot determine what persons are regulated, what conduct is prohibited, or what punishment may be imposed under a particular law, then the law will be deemed unconstitutionally vague. The Supreme Court has said that no one may be required at peril of life, liberty, or property to speculate as to the meaning of a penal law. Everyone is entitled to know what the government commands or forbids.

        Under the Due Process Clauses, individuals must be given adequate notice of their legal obligations so they can govern their behavior accordingly. When individuals are left uncertain by the wording of an imprecise statute, the law becomes a standardless trap for the unwary.

        Second, the void for vagueness doctrine curbs the arbitrary and discriminatory enforcement of criminal statutes and orders.   Criminal conduct must be understood not only by those persons who are required to obey them but by those persons who are charged with the duty of enforcing them.   Statutes and orders are intended to confine an officer's activities to the letter of the

32

law.  Detailed procedures by which police officers may perform an investigation, conduct a search, or make an arrest confer wide discretion upon each officer to act as he or she sees fit.

U.S. Border Patrol agents detained the plaintiff in Vancouver BC, and had no instructions or procedures, and were finally forced to make telephone calls, while plaintiff and her daughter Ann, waited in Federal custody.  Border Patrol agents had literally nothing to say, and released the plaintiff and her daughter an hour later.

10.     The Maryland Court Violated Federal Law (18 U.S.C. 2265)

Officers of the court Plaintiff was served with a temporary ex-parte restraining order in April 2008, in Palm Springs, CA, with no notice whatsoever.  Plaintiff has never been to Maryland, has no business in Maryland, and all of her child support records were destroyed by officers of the court, in Maryland.     The petition was issued in violation Maryland law:

"Requests for emergency and ex parte relief**\*** shall be filed with the civil clerk's office on the first floor of the Circuit Court. All parties must comply with the provisions of Maryland Rule 1-351(b). The Court generally requires **24 hours advance notice** to all interested parties unless circumstances preclude such notice. It is required that emergency and ex parte requests, **upon proper notice**, shall be presented ONLY on Mondays, Wednesdays and Fridays at 1:30 p.m. The criteria for obtaining emergency relief requires a showing that there is an imminent risk of substantial and immediate physical harm to a party or minor child."
*http://www.circuitcourt.org/family-law-cases-mainmenu-36/91#8.1%20Ex%20Parte%20Relief*

Plaintiff was living 2000 miles from the defendant in Palm Springs CA.  There was no imminent risk of physical harm to the defendant sufficient to warrant an emergency ex-parte temporary restraining order.

The Maryland Court placed the plaintiff's name on the National Registry of Domestic Violence Offenders without warrant.  The Federal government gives full faith and credit to protective orders issued by the States, under 18 U.S.C. 2265, however defendant's restraining order does not even meet the minimum Federal requirement:

33

(b) Protection order.--A protection order issued by a State, tribal, or territorial court is consistent with this subsection if--(1) such court has jurisdiction over the parties and matter under the law of such State,   Indian tribe, or territory; and (2) reasonable notice and opportunity to be heard is given to the person against whom the order is sought sufficient to protect that person's right to due process. In the case of ex parte orders, notice and opportunity to be heard must be provided within the time required by State, tribal, or territorial law, and in any event within a reasonable time after the order is issued, sufficient to protect the respondent's due process rights.

The Office on Violence Against Women, maintains the database.  The Director of the agency can be contacted below:

Catherine Pierce
Director
Office on Violence Against Women
810 7th Street NW
Washington DC  20531

11.    Defendant's Statements Were False

Defendant offered to drop his restraining order if plaintiff would stop talking to the Department of Defense.  Defendant spoke directly to plaintiff's attorney but refused to speak to the plaintiff.  Plaintiff did not "send death threats" to anyone, especially the NSA. Defendant made a bad faith threat of criminal prosecution, if plaintiff did not agree to his terms, then carried out his threat, knowing there was no real threat to his safety, and he was not being harassed as defined by the law9.

The Congressional Research Service speaks to the problem of Federal Agents and employees of the Executive Branch, making materially false statements to Courts of law:

*False Statements (18 U.S.C. 1001).*
*The general false statement statute, 18 U.S.C. 1001, outlaws false statements, concealment, or false documentation in any matter within the jurisdiction of any of the three branches of the federal government, although it limits application in the case of Congress and the courts.408More specifically it states:*
*I. Except as otherwise provided in this section, II. whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, III. knowingly*

34

*and willfully – IV. a. falsifies, conceals, or covers up by any trick, scheme, or device a material fact; b. makes any materially false, fictitious, or fraudulent statement or representation; or c. makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years 18U.S.C. 1503 (emphasis added) ("Whoever . . . endeavors to influence, obstruct, or impede the due administration of justice . . ."); 1512 (b) (emphasis added) ("Whoever . . . corruptly persuades another person, or attempts to do so . . . with intent to influence . . . the testimony of any person in an official proceeding . . .").*

12.   The Maryland Court Exceeded Its Jurisdiction

The Maryland Court acted without reasonable care, and barred from the Federal jurisdiction of Washington DC, knowingly exceeding it's jurisdiction.  State Courts do not have the jurisdiction to bar a citizen of from a Federal jurisdiction, and they do not have the jurisdiction to interfere with the First Amendment right to redress of the Federal government.

"District of Columbia is constitutionally distinct from states."  Palimore v. U.S. 93 S.Ct. 1670, 411 U.S. 389, 36 L.Ed. 2d 342.   Plaintiff is still wary of Federal buildings, airports, public carriers, driver's license checks, employment applications, rental applications, or anywhere her personal welfare might be compromised.

13.   Plaintiff is Entitled to Equitable Expungement

Plaintiff received a Notice Concerning Expungements from Judge Johnson, of the Anne Arundel County Courts, dated Nov. 6, 2009, notifying her that "there is no provision in the law for expungement of a criminal charge with a guilty verdict or of a non-incarerable motor vehicle violation, or a civil case...."

Almost all courts have concluded that they have the power to expunge criminal records, including executive-branch records, where the defendant's arrest or indictment was unlawful or unconstitutional; when probable cause for those events was lacking; where there was government misconduct in obtaining the charge; or, as one court has said, where impingement is necessary "to preserve basic legal rights." United States v. McMains, 540 F.2d 387, 389 (8th Cir. 1976).

1       14.    The Federal Court Has Jurisdiction to Expunge

2       In order for the Court to make an individualized assessment of whether, as a matter of

3   fairness, a moving party's criminal-justice records should be publicly available. While some

4   Federal circuit courts have held that they have the power to grant such equitable relief, others have

5   concluded that they do not. (United States v. Schnitzer, 567 F.2d 536 (2d. Cir. 1977)   The Federal

6   District Court has equitable authority to expunge on a showing of miscarriage of justice.

7

8       15.    Plaintiff Had A Duty To Report The Defendant

9       The Department of Defense maintains a website directing members of the public, and

10  the military, to report suspicious activity.

11  http://www.dm.usda.gov/ocpm/Security%20Guide/S5improp/Intro.htm#Reporting%20Improper

12  Suspicious behaviors include:  Alcohol Consumption, Allegiance to the United States, Criminal

13  Conduct, Drug Involvement, Emotional/Mental and Personality Disorders, Financial

14  Considerations, Foreign Influence, Misuse of Information Technology Systems, Personal Conduct,

15  Security Violations, etc.   The same behaviors are listed in the Security Clearance Directive DoD

16  5220.6.

17

18      The same website encourages the public to call a Hotline Number.  There are hotline

19  numbers for the Defense Department, Defense Intelligence Agency, National Security Agency,

20  Department of the Army, Naval Criminal Investigative Service, Air Force Office of Special

21  Investigations, Central Intelligence Agency, and Department of State, etc.   Plaintiff contacted the

22  Defense Department, the Defense Intelligence Agency, the NSA, the Naval Criminal Investigative

23  Service, and the CIA.  Plaintiff was basically wasting her time.

24

25      The website "How Spies Are Caught" states:

26      "Espionage is a high-risk criminal offense.  The traitor must fear arrest for the rest of his
    or her life, as the statute of limitations does not apply to espionage.  Former National Security

27  Agency employee Robert Lipka was arrested in 1996, 30 years after he left NSA and 22 years after

28      36

his last contact with Soviet intelligence."
http://www.dm.usda.gov/ocpm/Security%20Guide/Treason/Caught.htm#How%20Spies%20Are%20Caught,

Plaintiff was with the defendant, and another member of NSG, when they were approached by the KGB, in a train station in Yokohama Japan.   The agent was wearing a lapel pin with a picture of Lenin, clearly identifying him as an agent of the Soviet Union.  He handed the defendant a phone number, and told him to call.  The defendant had a brief conversation, and the agent left.   When plaintiff told the defendant to report the incident, the defendant told her to mind her own business.   Given the fact that the wives of Navy personnel, take their instructions from their husbands, plaintiff disregarded the incident.

When defendant enrolled at UC Davis in 1974, he instructed the plaintiff not to go the Russian House on campus, because there were KGB agents living in the house.   Defendant also instructed the plaintiff never to tell anyone in the Russian Department that he had been in the Navy. Plaintiff, again, disregarded what he said.

When defendant picked up 4 Soviet scientists at a private airfield near Sacramento, and drove them to the university in their family car, the plaintiff disregarded the incident, believing that the defendant was authorized to have contact with agents of the Soviet Union.  Defendant associated openly with people he described as KGB for over 4 years, and repeatedly told the plaintiff to mind her own business.

However, when she received an email from one of defendant's former friends in NSG, describing how he had reported the defendant for disclosing classified information while was drunk, plaintiff knew immediately that the defendant had lied to her.  Rather than second guess the defendant, she reported him to the Department of Defense.  Defendant took out a restraining order and tried to prevent the plaintiff from reporting him.

CIVIL NO: 11-CV-143-8-PHX-SRB

All of plaintiff's attempts to report the defendant were a glorious waste of time and energy.  There is very little accountability, or concern on the part of the Department of Defense.  And despite defendant's numerous violations of Federal law, (DDPA), defendant continues to enjoy total immunity.

The Department of Defense was required to conduct a thorough investigation of the defendant, when the plaintiff came forward with her information.  Their duties are clearly outlined in the National Security Act of 1947:

". . . (B)(i) there are reasonable grounds to believe, based on credible information, that the person is, or may be, disclosing classified information in an unauthorized manner to a foreign power or agent of a foreign power;
(ii) information the employing agency deems credible indicates the person has incurred excessive indebtedness or has acquired a level of affluence which cannot be explained by other information known to the agency; or (iii) circumstances indicate the person had the capability and opportunity to disclose classified information which is known to have been lost or compromised to a foreign power or an agent of a foreign power. . ."

16.    Plaintiff is Entitled to Punitive Damages

As a proximate result of defendant's above-described malicious abuse of the process, plaintiff suffered humiliation and mental anguish for over a year until the order expired, and continues to suffer mental anguish and humiliation, being unable to expunge the record.  Plaintiff was not able to redress the government or pursue any administrative action, amounting to punitive damages in an amount of $1,500,000.00.

**THIRD CAUSE OF ACTION**

**LIBEL AND SLANDER**

1.    Defendant Alleged That Plaintiff Sent "Death Threats" To The NSA.

Defendant submitted his handwritten declaration and petition to the Circuit Court in Anne Arundel County, and appeared before officers of the Court, and unknown persons in attendance, that the plaintiff sent "death threats" to his "employer."  Defendant played tape

38

recordings of plaintiff's phone messages, out of context, and made additional false representations

and statements that the plaintiff threatened his life and making harassing phone calls to his home.

    2.    Defendant's Statements Were False.

Defendant's statements were false.  Defendant's "employer" did not appear or offer

testimony.  Defendant made materially false representations about the plaintiff to the State Court in

Maryland.

    3.    Plaintiff Is Entitled to Punitive Damages

As a result of defendant's publication and oral testimony of these defamatory

statements, plaintiff has been greatly injured in her credit and reputation and suffered great pain and

anguish, to plaintiff's damage in an amount of $1,500.000.

**FOURTH CAUSE OF ACTION**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ("IIED")**

    1.    Plaintiff Took On the Full Burden of Support For 12 Years

Plaintiff suffered from chronic and life-threatening kidney disease throughout her

marriage to the defendant.  Plaintiff was disabled, and unable to hold down full time employment.

Plaintiff had corrective surgery in March 1976, several months before defendant moved from their

residence.  Plaintiff was in recovery when she had to look for a job and support JG.

Plaintiff explained to the defendant that she was unable to afford payments for her

attorney.  Nevertheless, defendants willfully and knowingly filed a fraudulent divorce action in the

Spokane County Courts, to avoid child support examinations in California.  Defendant paid less

than $12,000.00, in total, towards the support of his daughter JG, part of it going directly to

compensate for welfare payments made in his name.  Plaintiff took on the role of both parents, and

the full burden of support, while the defendant paid literally nothing material at all.

39

CIVIL NO: 11-CV-143-8-PHX-SRB

2.    JG Had Extraordinary Medical Needs

JG suffered from symptoms of undiagnosed autism, and physical limitations from birth, including damage to her motor skills.   Defendant was aware that she needed corrective leg braces and physical therapy.  She fell when she walked, was unable to play sports, and suffered from curved spine.   She also suffered from mental confusion, and was unable to concentrate in school. The local police had to go look for her when she couldn't find her way to school and back.   JG became lost easily, causing plaintiff mental anguish to have to search for her.  JG needed day care and rehabilitative services which plaintiff was unable to afford.   JG was a "latch-key" student, when plaintiff was forced to work full time.  JG's extraordinary costs were unaffordable without medical insurance.  Defendant had Federal dependent benefits the entire time.

When JG was 21, she recounted incidents of child abuse when she was left in the defendant's care, saying he threatened her never to tell the plaintiff.   JG needed emergency treatment for injuries, and ongoing care, and defendants said nothing.   By the time she reached high school, she was easily influenced by her peers.  JG got pregnant when she was 16 years old. Plaintiff simply asked the District Attorney to locate the defendant.  Defendant knew where JG lived, and did not place one phone call or write a single letter.  The fact that the defendant did not inquire about JG's welfare in 1987, after being served in the Maryland Courts, speaks volumes about intent.

Plaintiff paid all of JG's adult expenses from 1990 until 1994, when she and her two small grandchildren lived with the plaintiff. Plaintiff called the defendant, asking for his help, and he refused.

3.    Defendant Stated "I Don't Give A Damn About Her!"

In 2003, plaintiff's husband, Frank Hodges, called the defendant on JG's behalf, trying to ease the hostilities.   Defendant shouted, "I don't give a damn about her!" and hung up the phone.

40

1   Mr. Hodges telephoned the defendant again in 2008, after discovery that the defendant had worked

2   for the Federal government for the past 30 years.   The Defendant became enraged, stating, "It's not

3   my problem!" Defendant hung up the phone again.

4           4.      Plaintiff Was Hospitalized

5

6           Plaintiff was hospitalized in 2007, and had emergency surgery, at the same time she was

7   dealing with defense investigators and the FBI.   Plaintiff was in recovery when the defendant took

8   out his restraining order.   Plaintiff is 64 years old, and has only one kidney.   Plaintiff suffers from

9   hypertension which could result in life-threatening renal failure and complications as a result of

10  sudden stress.   Defendant could have easily answered the phone and made at least an attempt to

11  resolve the hostilities.

12          5.      Plaintiff Suffered Extreme Mental Anguish

13

14          As a direct and proximate result of defendant's actions, plaintiff suffered extreme

15  mental anguish, worry and distress, which could lead to permanent disability.   Plaintiff has no

16  health insurance, and would be unable to pay any associated medical expenses.

17          6.      Plaintiff Suffered the Loss of Companionship

18          Defendants caused irreversible damage to plaintiff's relationship with her daughter JG

19  and her two grandchildren.   JG had unresolved anger and hostility, and suffered abandonment

20  issues, and was unable to confront the defendant, and instead, blamed the plaintiff.   JG dropped out

21  of college, married someone she met on the Internet, and moved, leaving no forwarding address.

22

23  JG uses an alias, and wants no contact at all with either of her parents.   Plaintiff gave willingly, and

24  offered her full support, where defendant offered nothing.

25          Defendants' actions were intentional, extreme, outrageous, and cruel, exceeds the

26  bounds of common decency.   Defendant's conduct was atrocious, and utterly intolerable.

27          7.      Defendant Committed Acts Of Child Abuse and Criminal Abandonment
28                                                  41

1

Nearly all States provide civil definitions of child abuse and neglect in statute. States

2

recognize the different types of abuse in their definitions, including physical abuse, neglect, sexual

3

abuse, and emotional abuse. Some States also provide definitions in statute for parental substance

4

abuse and/or for abandonment as child abuse.

5

6

Defendant could have easily spared the plaintiff the personal expense of raising a small

7

child without a father.  Defendant could have come forward and took on his responsibilities.

8

Instead, defendants sent the plaintiff on a 'wild goose chase', searching for them, hiding in plain

9

sight, and playing vindictive head games.  The emotional cost to JG and the plaintiff, lasted a

10

lifetime.

11

    8.     Defendant Used Silence As A Weapon

12

Defendant has refused to speak to the plaintiff to the plaintiff for over 35 years,

13

beginning when JG was nine (9) years old.   Defendant gave the plaintiff the "silent treatment" for

14

confronting him, just as he had done during their marriage.  The "silent treatment" is a form of

15

16

psychological abuse:

17

    http://emotional-verbal-abuse.suite101.com/article.cfm/emotional_abuse_is_mental_abuse

18

Oct 4, 2008 **Karen Stephenson**

19

20

Silent treatments are destructive forces in abusive relationships. Silence is a silent form of anger that says you do not exist. Abusers use this as a form of punishment.

21

22

There are no reliable statistics that clearly state the extent of this specific form of abuse. Although some studies do indicate the level of *emotional abuse* that exists in our society, they do not target the "*silent treatment*". Silent treatments should not be confused with what is referred to as the "cooling off" period after an argument.

23

24

http://www.healthaftertrauma.com/Ten-Healthcare-Consequences-Resulting-from-Psychological-Battering.html

25

**Ten Healthcare Consequences Resulting from "Psychological Battering"** Ellen Taliaferro, MD, FACEP

26

27

Did you know that psychological battering is bad for your health? Victims and survivors of

28

42

intimate partner violence (IPV)--also referred to as domestic violence, have long known that they are never the same after the abuse. The impact of that abuse lingers on and results in poor health for many.

Until the last few years, little research focused on the health consequences of IPV—especially those stemming from non-injury abuse. What research did exist, for the most part, focused on the consequences of injuries past physical abuse. Ignored were the health consequences of long-term psychological abuse.

In the year 2000, Dr. Ann Coker and colleagues published the results of their survey of 1152 women seeking medical care from family medicine clinics. These researchers discovered that 53.6% of these women had experienced some type of IPV sometime in their lifetime. For most, the abuse was experienced at around the age of 22.

What distinguished their research from previous research is the fact that they examined psychological abuse as well as physical abuse. They found that 13.6% of the women surveyed experienced psychological IPV without any form of physical IPV. Psychological violence is defined as psychological battering or emotional abuse. It is characterized by the victims' continuous feelings of susceptibility to danger, loss of power and control, and entrapment.

Dr. Coker and her colleagues found that when compared to women who never experienced IPV, women who experienced psychological IPV were significantly more likely to report their physical and mental health to be poor. They also reported ten adverse health outcomes arising from their psychological battering :

Ten bad health outcomes associated with psychological battering in intimate partner violence settings

• Disability preventing work • Arthritis • Chronic pain • Migraine and other frequent headaches • Onset of stammering • Sexually transmitted infections • Chronic pelvic pain • Stomach ulcers • Spastic colon (irritable bowel syndrome) • Frequent indigestion, diarrhea or constipation

**GOVERNMENT ESTOPPEL**

      1.      Defendant Acted In His Official Capacity

      Clearly, the plaintiff does not have a duty to chase down an executive officer at the NSA, and then defeat nefarious implications of "national security" to obtain a lawful order for child support.  Plaintiff was denied a right to an adequate remedy by officers of the court, who had an allegiance to the defendant through his employment at the NSA.

      If defendant had appeared as a private citizen in a civil action for child support, officers

CIVIL NO: 11-CV-143-8-PHX-SRB

of the court would have compelled production of his Federal tax returns, and examined him for his fitness to pay support.  Defendant received special treatment from officers of the court, a violation of Government Ethics. Defendant is therefore barred from asserting a defense under the doctrine of Government Estoppel.   Defendant is a Bivens defendant, and cannot "switch" roles and assert that he is an individual in an independent action arising from his affirmative misconduct as a Federal employee:

"The Estoppel principle has also held against Federal employees, specifically against employees at the IRS, who have the public trust:  Silence can only be equated with fraud where there is a legal or moral duty to speak, or where an inquiry left unanswered would be intentionally misleading. . . We cannot condone this shocking behavior by the IRS. Our revenue system is based on the good faith of the taxpayer and the taxpayers should be able to expect the same from the government in its enforcement and collection activities." U.S. v. Tweel, 550 F.2d 297, 299. See also, U.S. v. Prudden, 424 F.2d 1021, 1032; Carmine v. Bowen, 64 A. 932.

The Federal Circuit supported this assertion, in dicta, in <u>United Pacific Ins. Co. v. Roche</u>, stating, "Our own precedent dictates 'that if equitable estoppel is available at all against the government, some form of affirmative misconduct must be shown *in addition* to the traditional requirements of estoppel." (Zacharin v. U.S., 213 F.3d 1366, 1371 (Fed. Cir. 2000).

"The nature of the <u>representations and of the conduct of the defendant are</u> of crucial significance in determining whether the plaintiff is to be allowed to invoke this equitable principle." Burke v. Gateway Clipper, Inc., 441 F.2d 946 (3d Cir. 1971).

Plaintiff filed a Federal Tort Claim with the National Security Agency on August 3, 2009, for the NSA's failure to enforce the security clearance laws, and for allowing the defendant to use the color and scope of his employment at the NSA to deprive the plaintiff of child support, and her due process and rights under the Constitution.

Plaintiff received a denial letter on Nov. 18, 2010, from Lieutenant Colonel Gregory S. Mathers, US Army, Chief, Tort Claims Division, Office of the Judge Advocate General, Fort Meade MD, as follows:

CIVIL NO: 11-CV-143-8-PHX-SRB

1

2
"This notice constitutes final administrative action on your claim, filed individually and as the custodial parent of JG Grimaud, against the United States for $300,000 for the alleged failure of the National Security Agency and the Department of Defense to conduct appropriate security clearance investigations regarding Steven Grimaud, and for allegedly denying your rights to Due Process and Equal Protection under the United States Constitution. The claim demands $300,000 as compensation for Steven Grimaud's alleged failure to provide adequate financial support to you for the costs of raising his daughter, JG Grimaud.

3

4

5

6
Your claim is denied. The claim was considered under the Federal Tort Claims Act (FTCA) Title 28 of the United States Code Section 1346(b), 2671-80, which provides a waiver of sovereign immunity for tortuous acts of an agency's employees acting in the scope of their federal employment where the commission of the same acts by a private person would give rise to tort liability under state law."

7

8

9
Plaintiff filed the same Federal Tort Claim with the Secretary of Defense, Robert Gates,

10
and the Director of National Intelligence, Dennis Blair, on the same date, August 3, 2009.   Thus

11
far, plaintiff has received no letter of acknowledgement or denial from either office.

12

13
2.    Failure To Pay Child Support Is Not A Tort.

14
Failure to pay a past due child support obligation is a criminal offense, punishable

15
under the Deadbeat Parent Punishment Act.

16
The Office of Personnel Management ("OPM"), maintains a question and answer page

17
on their website, that clears up their procedures for obtaining background checks on applicants for

18
security clearances:

19

20
"*Do you ever interview someone's ex-spouse or relatives?:*
*Yes, although, in many instances, interviewing ex-spouses or relatives is not mandatory.*"

21

22
*U.S. Office of Personnel Management 1900 E Street, NW, Washington, DC 20415 | (202) 606-1800 | TTY (202) 606-2532   http://www.opm.gov/Products_and_Services/Investigations/FAQs.asp*

23

24
Applicants for Top Secret Security Clearances can avoid a lot of inquiry into their

25
past, as long as Federal investigators never contact their former spouses.   It is relatively easy for an

26
applicant to hide their Federal employment from a former spouse under the same misguided policy.

27
Defendant's clearance check was expedited on recommendation of his recruiters and college

28
45

CIVIL NO: 11-CV-143-8-PHX-SRB

professors who barely knew the plaintiff.   Plaintiff was never included in any "vetting" for Senate confirmations, or informed that her former husband received an appointment by the President.

Defendant was required to file a truthful and complete financial disclosure with the Department of State.  Defendant concealed his marriage, his daughter JG, and his past-due obligation for child support from the Department of State, the NSA, and the NVTC.

Financial Disclosures Required by Employees of the Executive Branch:
http://www.usoge.gov/common_ethics_issues/financial_disclosure

Interestingly enough, the NSA maintains a commitment to all Americans:
http://www.nsa.gov/commitment/index.shtml

> *"These are our commitments to you, our fellow citizens:*
>
> *We will act with integrity to advance the rights, goals, and values of the Nation.*
>
> *We will adhere to the spirit and the letter of the Constitution and the laws and regulations of the United States.*
>
> *We will support and protect our troops in the field.*
>
> *We will combat terrorism around the globe - when necessary, putting our lives on the line to preserve the Nation.*
>
> *We will provide our policymakers, negotiators, ambassadors, law enforcement community, and military the vital intelligence they need to protect and defend the Nation.*
>
> *We will defend the national security networks vital to our Nation.*
>
> *We will be a trusted steward of public resources and place prudent judgment over expediency.*
>
> *We will continually strive for transparency in all our review, monitoring, and decision-making processes.*
>
> *We will be accountable for our actions and take responsibility for our decisions.*

46

CIVIL NO: 11-CV-143-8-PHX-SRB

1    The last "commitment" is a paradox.  The NSA, at any time, by their own discretion,

2  can refuse any request for information, whether it violates due process and equal protection or not.

3  The NSA opens up an inviting door to challenge it's authority under the Constitution, with vague,

4  unintelligible, and ambiguous references to "privacy, confidentiality, security, or "other"

5  restrictions":

6

7          *We will honor Open Government and Transparency mandates by making*

8          *timely and accurate information available to the public, subject to valid privacy,*

9          *confidentiality, security or other restrictions under existing law and policies."*

10   The NSA offers a Top Secret Security Clearance to the defendant, but did not contact

11 the plaintiff to get her information. Plaintiff knew the defendant to be wholly unfit to serve in any

12 area of defense intelligence.  In fact, when defendant suggested that he could "make a lot of money

13 in Washington DC", plaintiff suggested he find another line of work.  Plaintiff knew the defendant

14 to be an untrustworthy, unreliable, alcoholic, who rambled incoherently when he was drunk.

15 Defendant was reported at least once by a member of his own Navy squadron, for discussing

16 classified information while he was drunk.  The NSA failed to conduct a thorough and complete

17 background check on the defendant, gave him a Top Secret Clearance, and then absolved

18 themselves of any responsibility under the Doctrine of Sovereign Immunity.

19   Defendant was "busted" down in rank from E3 to E2, and discharged.  Defendant

20 continued to drink, and believed that he could fake a polygraph and lie on an application to the

21 NSA.

22

23   The NSA gave the defendant a Top Secret Security Clearance, without checking his

24 background information with his ex-wife.   If the NSA had contacted the plaintiff at any time in the

25 past 35 years, she would have told them that the defendant is a "deadbeat.".

26

27   It came as a big shock to the Department of Defense that the defendant was a

28
                                    47

CIVIL NO: 11-CV-143-8-PHX-SRB

"deadbeat." They didn't even know he had a daughter.   The NSA, as the nation's "gatekeeper" gives out security clearances, then absolves themselves of any responsibility for their employee's criminal actions.

In Bivens v.6, Federal Agents violated the 4th Amendment.  They did not commit a statutory criminal offense.  The Federal Statute runs continuously through all its revisions.

Defendant has been in default since 1976, beginning with URESA:

"The Deadbeat Parents Punishment Act (DDPA) of 1998, amended the CSRA of 1992 and established felony violations for traveling in interstate or foreign commerce to evade a child support obligation or for failing to pay a child support obligation which is greater than $10,000 or has remained unpaid for a period longer than two years. The balance of the CSRA and its enforcement remains intact."

Alcohol abuse is expressly forbidden by the Security Clearance Directive:

GUIDELINE G
Alcohol Consumption
E2.A7.1.2.1.  Alcohol-related incidents away from work, such as driving
while under the influence, fighting, child or spouse abuse, or other criminal incidents
related to alcohol use.
    DOD 5220.6   http://www.dtic.mil/whs/directives/corres/html/522006.htm

Defendant was disciplined for the same alcohol related security breaches in the Navy.

Defendant violated essentially the same DoD Directive 5210.50 when he was in the Navy.  He also disclosed classified information when he was drunk:

*Unauthorized Disclosure of Classified Information to the Public.*

http://www.fas.org/irp/doddir/dod/d5210_50.pdf

Despite the concern for national security, the NSA actually tolerates alcoholism:

*"NSA Alcohol Rehabilitation Program   963-5420/688-7312  (NSA Employee Handbook)*

The NSA Office of Medical Services (M7) has a staff of physicians, clinical psychologists and an alcoholism counselor. All are well trained to help individuals help themselves in dealing with their problems. Counseling services, with referrals to private mental health professionals when appropriate, are all available to NSA personnel. Appointments can be obtained by contacting M7 directly. When an individual refers himself/herself, the information discussed in the counseling sessions is regarded as privileged medical information and is retained exclusively in M7 unless it

48

pertains to the national security.

Counseling interviews are conducted by the Office of Civilian Personnel (M3) with any civilian employee regarding both on and off-the-job problems. M3 is also available to assist all personnel with the personal problems seriously affecting themselves or members of their families. In cases of serious physical or emotional illness, injury, hospitalization, or other personal emergencies, M3 informs concerned Agency elements and maintains liaison with family members in order to provide possible assistance."

Plaintiff informed the NSA about the defendant's alcohol abuse, and the NSA took no interest in resolving anything.  The NSA protected the defendant, despite all his numerous violations of the security clearance directive, government ethics, and Federal law.   Defendant has been a member of Alcoholics Anonymous since he was married to the plaintiff.  In fact, the plaintiff dragged him to a meeting of AA.   Alcoholics Anonymous relies on anonymity.   Where does anonymity cross the line when it comes to security clearances?

And finally, Everette E. Jordan, Director, the defendant's direct supervisor at the NVTC/FBI, in his statement before the Senate Committee on Homeland Security and Governmental Affairs Subcommittee on Oversight of Government Management Washington, DC January 25, 2007, the defendant passed a "vigorous national security background check": (http://www.fbi.gov/news/testimony/promoting-the-nations-foreign-language-strategy)

"The professionals who work for the NVTC are American citizens **who have passed a vigorous national security background check**. . .the Center is an integral part of the national intelligence community. . . But all of the information is important to the U.S. government's ability to protect the nation from many threats, both in the homeland and abroad. . . The NVTC participates in the Foreign Language Executive Committee of the Office of the Director of National Intelligence and is also a member of the ODNI Foreign Language Working Group. The ODNI provides the bulk of the financial support for the NVTC budget, with FBI acting as executive agent."

When the defendant was in the Navy Security Group, he violated DoD Directive 5210.50, *Unauthorized Disclosure of Classified Information to the Public*, while he was drunk. Defendant, who had a history of alcohol abuse mixed with national security, continued his employment at the NSA for the next 35 years, with very little regard for the rights of the plaintiff

49


and his own daughter.  http://www.fas.org/irp/doddir/dod/d5210_50.pdf.

4.    Defendant Violated Government Ethics

It is a misuse of Federal employment and a violation of Government Ethics, for a

Federal Agent to appear in any civil action, asking for special treatment from officers of the court:

"http://www.dod.mil/dodgc/defense_ethics/ethics_regulation/dir550007.pdf Misuse of Federal
Employment/ Federal Agent Demoted for I.D.ing Herself as a Federal Agent to a Police Officer:

"Because law enforcement officials may be tempted to treat other law enforcement
officials more favorably, the Department determined the employee presented her government
credentials to the police officer in hopes of receiving more favorable treatment.  The federal
employee did not explicitly ask the police officer for any favors, but the circumstances led her
agency to the conclusion that she had attempted to use her official position for personal gain,
which is prohibited by federal ethics rules."

When the law imposes a duty on an officer, whether by common law or statute, and he

neglects to perform it, he may be held accountable for such neglect, and in some cases such

neglect will amount to a forfeiture of the office.  The NSA, the DoD, and the FBI, are all aware

that the defendant abused his Federal employment for personal gain.  Defendant is presently still

employed as an executive officer by the Department of Defense.

"DoD GS-12 Removed for Misuse of Authority

"A GS-12 Recreation Program Manager who supervised approximately 75 civilian and
military subordinates was removed from his position for several ethical violations, including the
failure to avoid the appearance of impropriety. . ."

http://www.dod.mil/dodgc/defense_ethics/ethics_regulation/dir550007.pdf

5.    Defendant Violated the Ten Core Concepts for the Department of Defense

The Department of Defense maintains Ten Core Concepts for employees to consider if

they are faced with ethical dilemmas:

Department of Defense Regulation 5500.7-R, chapter 12, section 5, pp. 155-157
Applying the Ten Core Concepts

When faced with an ethical decision, you may want to ask yourself the following questions:

50

\* Is my action legal?
\* Am I being truthful, fair, and honest?
\* Will I bring shame upon my family, my organization, or myself?
\* Am I harming someone?
\* Could my action appear inappropriate?
\* Is my action consistent with my personal ethical principles?
*If you ever are unsure of what to do, seek guidance through your management, your ethics official, or your component's legal office.*
(Detail explanation of Ten Core Concepts)

6.      Defendant Violated His Security Clearance

Defendant's Security Clearance falls under DoD Directive 5220.6, and states as follows:

"PERSONAL CONDUCT E2.A5.1.1. Conduct involving questionable judgment, untrustworthiness, unreliability, *lack of candor, dishonesty,* or unwillingness to comply with rules and regulations *The following will normally result in an unfavorable clearance action or administrative termination of further processing for clearance eligibility:*

FINANCIAL CONSIDERATIONS E2.A6.1.2.1.  A history of not meeting financial obligations; E2.A6.1.2.2.  Deceptive or illegal financial practices such as . . .intentional financial breaches of trust; E2.A6.1.2.3.  Inability or unwillingness to satisfy debts;

7.      Plaintiff Was Denied Defendant's Information By the Federal Government

Plaintiff wrote a letter to the Secretary of Defense in 2007, Robert Gates, explaining the circumstances.  The Secretary of Defense confirmed that the plaintiff was not entitled to any information without the defendant's express consent.   Defendant never gave his consent, or the Secretary would have referred the matter to the NSA's Department of Internal Affairs.

Defendant was always aware that the NSA would never disclose his information, without his express consent, therefore he withheld his consent.   To date, defendant has never disclosed any information at all to the plaintiff, or shown the least bit concern to cooperate.

8.      Defendant Is Set Apart In A Separate Class

Defendant appeared as an employee of the Executive Office of the President. Defendant's employment at the NSA was known to officers of the court, as evidenced in the pleadings.  Defendant was set apart in a separate class of Federal employees under the National

51

1  Security Act of 1947, as defined below:

2      " NATIONAL SECURITY ACT OF 1947

3      . . .(L) Such other elements of any other department or agency as may be designated by
the President, or designated jointly by the Director of National Intelligence and the head of the

4  department or agency concerned, as an element of the intelligence community.
       . . .(5) The terms "national intelligence" and "intelligence related to national security"

5  refer to all intelligence, regardless of the source from which derived and including information
gathered within or outside the United States, that—

6      . . .(A) pertains, as determined consistent with any guidance issued by the President, to

7  more than one United States Government agency; and (B) that involves, (i) threats to the United
States, its people, property, or interests; (ii) the development, proliferation, or use of weapons of

8  mass destruction; or (iii) any other matter bearing on United States national or homeland security.
."

9

10         The National Security Act of 1947 established the Office of the Director of National

11  Security.  ("ODNI")  Defendant's employment at the NSA, is at the discretion of the Director of

12  National Intelligence.  The ODNI maintains a searchable database available for review at

13

14  http://odni.gov/reports/IC_Legal_Ref_2009.pdf     The term "child support" produces no results.

15  Defendant's child support has nothing at all to do with "national security."

16

17  **ESTOPPEL BY SILENCE**

18      1.    Defendants Are Barred From Asserting A Defense By The

19            Doctrine of Estoppel by Silence

20         Estoppel arises where a person is under duty to speak or failure to speak is

21  inconsistence with honest dealings.   An agreement inferred from silence rests upon principles of

22  estoppel. Letres v Washington Co-op Chick Assn, 8 Wash 2d 64, 111 P2d 594 at 596. "Estoppel,

23  must announce to bad faith," Wise v US, D.C. Ky. 38 F Supp 130 at 134; duty & opportunity to

24  speak, Merry v Garibaldi, 48 Cal App 2d 397, 119 P2d 768 at 771.

25

26         "Silence can only be equated with fraud where there is a legal or moral duty to speak,

27  or where an inquiry left unanswered would be intentionally misleading. . ." U.S. v. Tweel, 550

28                                      52

1    F.2d 297, 299. See also, U.S. v. Prudden, 424 F.2d 1021, 1032; *Carmine v. Bowen*, 64 A. 932.

2              Defendants have refused to speak to the plaintiff or offer any explanation for their

3    silence for the past 35 years.  Plaintiff wrote letters, and placed phone calls, before she lost her

4    temper.  Defendant's are therefore barred from asserting a defense under the docrine of estoppel by

5    silence.

6

7

8    **DAMAGES**

9         1.    Statutory Damages

10             Plaintiff is entitled to statutory damages, sometimes made available because it is too

11   difficult to calculate actual damages.    Past due child support is determined by State and Federal

12   Guidelines.  [101]  The only way to determine a dollar amount for defendant's past due child

13   support, is to retain a qualified domestic relations law firm to make those calculations.  Defendant,

14   of course, would be responsible for those costs.

15

16             Plaintiff asked the Maryland Attorney General for an audit of defendant's past due

17   child support obligation in 2008.  Defendant produced a copy of the 1987 agreement for $260.00,

18   and stated that the plaintiff agreed.  The Maryland Attorney General did not acknowledge

19   defendant's "willful failure to acknowledge a known legal duty", as set forth by the United States

20   Attorney General, and upheld by the courts.  Defendant's audit was conducted by an untrained

21   clerk in the office of child support enforcement.  Defendant had an opportunity to be truthful in

22   2008, but failed to tell the clerk that the court refused to examine him according to law.  Defendant

23   produced no other documentation. The Maryland Office of Child Support determined, wrongly,

24   that the defendant had met his child support obligation.

25

26        2.    Compensatory Damages

27             Plaintiff is entitled to compensatory damages that would restore her to her rightful

28                                        53

position, equal to approximately 12 years of child support based on defendant's assets and earnings. Plaintiff is also entitled to compensatory damages equal to the value of defendant's Federal dependent benefits as they applied to JG. Plaintiff paid out pocket for medical expenses, and JG often went without proper care. Plaintiff was forced to default on creditors and declared bankruptcy, which limited her ability to obtain credit over the next 10 years. Plaintiff was forced to pay cash, and excessively high interest rates for car loans. Plaintiff's losses can only be estimated.

Defendant was legally obligated to pay child support from July 5, 1976 until Feb. 12, 1989, JG's 18th birthday. Plaintiff is entirely ignorant of defendant's net worth between those dates, or anytime after, and has no knowledge of the extent to which she has been defrauded.

3.    Special Damages.

Plaintiff is entitled to damages that compensate her for quantifiable monetary losses such as medical bills and ordinary costs for food, shelter, and clothing, over a period of 12 years (direct losses). Plaintiff is also entitled to lost earnings (consequential damages are a result of JG's special needs, day care problems, and inability to afford ordinary rent. Plaintiff was never able to afford a down payment for a home, and never purchased a home for herself and JG. Plaintiff sought out a lower cost of living, and moved frequently. Plaintiff's rent in California, in 1984 was $750.00 a month. Plaintiff moved to Tucson AZ, and paid $250.00 a month, and compensated the loss in earnings by taking jobs paying between $7.00 an hour and $10.00 an hour.

4.    General Damages

Plaintiff is also entitled to general damages, for which there is no exact dollar value to the plaintiff's losses. It is impossible to calculate the plaintiff's losses. General damages can include, for example, pain and suffering, compensation for a shortened life expectancy, and loss of the companionship of a loved one.

54

CIVIL NO: 11-CV-143-8-PHX-SRB

1

5.      Punitive Damages

2

3          Plaintiff is entitled to punitive damages awarded over and above special and general

4      damages, that are awarded to punish a losing party's willful or malicious misconduct.   It was not a

5      mistake that the Maryland Court barred the plaintiff from Washington DC.  Defendant requested

6      that special provision in his own handwriting.  The Clerk of the Court, defendant's friend, allowed

7      him to make that hand-written request, then filed the Petition and set it for emergency hearing.

8          The common principle behind vagueness and overbreadth is the requirement that laws

9      have a minimum degree of certainty.  The rule of law prescribes that the law must be capable of

10     guiding the behavior of its subjects.   If law is not capable of guidance, individuals will not know

11     how to operate safely within the bounds of the law nor understand the ramifications of their actions.

12

13         The Maryland Court was aware that its jurisdiction was limited to those causes that

14     exist in the State of Maryland.  The defendant would have us believe that every civil restraining

15     order in Maryland against a Federal employee, contains a provision that the respondent is restrained

16     from Washington DC.  The additional request that plaintiff stop talking to the CIA, raises some

17     suspicion.  Defendant had no way to know if the plaintiff was talking to the CIA or not.

18         Defendant used the Justice system, and the full force of the Executive Office, to

19     threaten, harass, and put fear of criminal prosecution in the plaintiff, for reporting him to the

20     Department of Defense:

21

22         "Plaintiff argues that the power of the Court to devitalize a judgment is **not limited to**
       **the amount of specific damages.** Plaintiff can prove he suffered as a direct result of the act of

23     fraud, but must also consider the amount such fraud has damaged the integrity of the institution of
       justice itself. Hazel-Atlas Glass Co. v. Hartford Empire Co., 322 U.S. 238 64 Sect. 997, 1000, 88 L.

24     Ed 1250.

25

26         The Congressional Research Service reported: "The Fourteenth Amendment, Section

27     1, Rights Guaranteed, Procedural Due Process: Civil, gives the power of the States to regulate

28

55

1   procedure:

2      "Generally.  The due process clause of the Fourteenth Amendment does not control mere

3   forms of procedure in state courts or regulate practice therein. A State "is free to regulate procedure

    of its courts in accordance with it own conception of policy and fairness unless in so doing it

4   offends some principle of justice so rooted in the traditions and conscience of our people as to be

    ranked as fundamental."

5

6      Plaintiff was denied a fundamental right to be treated fairly and equally by officers of

7   the State courts in Maryland and in Arizona.

8      Plaintiff was forced to take on a burdensome Federal action, on her own behalf, when

9   State and Federal child support enforcement officers could have easily taken the information and

10  agreed to represent the plaintiff's interest.   Defendant was absolutely defiant, where he could have

11  easily avoided an action in the Federal Courts.

12

13     The general rule in personal tort actions is that the plaintiff is entitled to recover such a

14  sum which will be a fair and just compensation for the injuries sustained.  The retaliatory

15  restraining order and false imprisonment, constitutes the basis for the recovery of at least nominal

16  damages. Marshall v. District of Columbia, 391 A.2d 1374, 1380 (D.C. 1978).

17     Action for damages in false imprisonment flows from the unlawful detention.  A

18  plaintiff who has suffered injuries can be compensated for (a) physical injuries; (b) mental

19  suffering; (c) loss of earnings; (d) injury to the reputation; (e) reasonable and necessary expenses

20  incurred, like attorneys' fees; and (f)  deprivation of any right caused by the loss of liberty.

21

22     The scope of damages recoverable is much more than what is already suffered.  The

23  general rule is that, in an action for personal torts, future damages to an injured person are an

24  element of recovery.  However, there must be reasonable certainty that action will result in false

25  imprisonment.  Only those damages found to be a natural result of false imprisonment are

26  recoverable. Moreover, the fact that no physical injury was inflicted on one complaining of false

27  imprisonment is not a ground for denying the recovery of reasonable compensation for mental

28

56

1   suffering.  Humiliation, fright, and shame are elements considered in assessing the mental suffering.

2        In an action for false imprisonment, a plaintiff can demand: (a) Nominal or

3   compensatory Damages; (b) Punitive or exemplary damages; or (c) Aggravated damages.  An

4   award of nominal damages will be insufficient and erroneous where the facts proven indicate a right

5   to greater damages. Atkins v. New York City, 143 F.3d 100, 103 (2d Cir. N.Y. 1998).

6

7        Generally, ill will and malice are not elements of the tort.  When ill will and malice are

8   proven in false imprisonment, punitive damages can be awarded in addition to compensatory

9   damages or nominal damages.  Exemplary or punitive damages are awarded as compensation and

10  punishment.  They are awarded for an imprisonment effected recklessly, oppressively, insultingly,

11  and maliciously with a design to oppress and injure the plaintiff.  Punitive damages are awarded in

12  cases where the defendant's actions are indifferent to the rights of others or in intentional violation

13  of his/her rights.  Additionally, when there is abuse of power by the state, exemplary damages are

14  awarded.  Punitive damages are awarded as a means of deterring defendants from such future

15  conduct.  Aggravated damages can be awarded in cases where imprisonment in itself is offensive.

16

17        6.    Aggravated Damages

18        Aggravated damages are the special and highly exceptional damages awarded on a

19  defendant by a court, when his/her conduct amounts to tortuous conduct subjecting the plaintiff to

20  humiliating and malicious circumstances. Additional damages are also awarded in situations where

21  a plaintiff is subjected to distress, embarrassment, or humiliation. Aggravated damages are basically

22  compensatory in nature and they are awarded for the aggravated damage that is caused to a

23  plaintiff. Aggravated damages are determined on the basis of the intangible injury inflicted on a

24  plaintiff. Intangible injury includes the pain, anguish, grief, humiliation, wounded pride, damaged

25  self-confidence or self-esteem, loss of faith in friends or colleagues, and similar matters that are

26  caused by the conduct of a defendant. When compared to punitive damages aggravated damages

27

28

require proof of injury. Aggravated damages can be attained as additional compensation if the injured establishes that a breach of contract caused mental distress.

PRAYER

Plaintiff respectfully asks this honorable Court for relief as follows:

1.    To devitalize and set aside the 1987 agreement for $260.00 between the plaintiff and the defendant under FRCP60, for Fraud Upon The Court, and restore the parties to their original condition in 1987;

2.    For an Order for past due child support against the defendant, plus interest accruing, for years 1976 until 1989, to the present time, according to Federal law;

3.    For an Order directing the Attorney General of the United States to expunge the plaintiff's name from the Domestic Violence Registry as not conforming to FRCP65 or meeting the minimum notice requirements of 18 U.S.C. 2265;

4.    For an order denying defendant Melinda Grimaud an exclusion for "injured spouse" as it applies to any IRS garnishments in connection with her marriage to Steven Grimaud, or other any other Federal exclusions;

5.    For costs of suit, service of process, sheriff and marshal fees, and all other fees and costs associated with collection, to be awarded to the defendants;

6.    For Special Damages in an amount of Five Hundred Thousand Dollars ($500,000.00);

7.    For Combined Punitive Damages in an amount of Three Million Five Hundred Thousand Dollars ($3,000,000.00)

8.    For Aggravated Damages in an amount of Two Million Dollars ($2,000,000.00);

/ / /

58

CIVIL NO: 11-CV-143-8-PHX-SRB

9.    For all other relief as the Court deems necessary and proper.

I certify that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully submitted this 25th day of July, 2011.

_Sharon Hodges_
Sharon Hodges
Plaintiff pro se

59

1

## CERTIFICATE OF SERVICE

2

3

4

I hereby certify that a copy of the foregoing Plaintiff's First Amended Complaint was this date served upon all parties by placing a copy of the same in the United States Mail, postage prepaid, and sent to their last known address as follows:

5

6

7

STEVEN WRAY GRIMAUD
1600 Angus Court
Crofton MD  21114-2002

8

9

MELINDA GRIMAUD
1600 Angus Court
Crofton MD  21114-2002

10

11

Phoenix AZ, this 25th day of July, 2011.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CIVIL NO: 11-CV-143-8-PHX-SRB